2019 UT App 156

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CHRISTOPHER JAMES BONDS,
Appellant.

Opinion
No. 20180238-CA
Filed September 26, 2019

Third District Court, Salt Lake Department
The Honorable Keith A. Kelly
No. 161912346

Nathalie S. Skibine, Attorney for Appellant

Sean D. Reyes and Jeffrey S. Gray, Attorneys
for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN FORSTER and DAVID N. MORTENSEN
concurred.

HARRIS, Judge:

¶1     After a scuffle, Christopher James Bonds fatally shot his friend (Victim). In an interview with police a few hours after the shooting, Bonds admitted that he had shot Victim, but claimed that, right before the shooting, Victim had threatened to harm Bonds's children, and that he had shot Victim in order to protect them. A jury was not persuaded by Bonds's theory of self-defense, and convicted Bonds of murder, rather than acquitting him or convicting him of manslaughter. Bonds now appeals, asserting that his confession was coerced and should have been suppressed, and that his trial attorney provided ineffective assistance by failing to object to improper jury instructions regarding self-defense, as well as part of the State's evidence

regarding self-defense. We conclude that the trial court did not err by denying Bonds's motion to suppress his confession. But we agree with Bonds that his attorney provided ineffective assistance, and therefore reverse all but one of his convictions and remand for a new trial.

BACKGROUND[1]

¶2    Bonds and Victim were good friends and socialized often; indeed, about a week before the events giving rise to this case, Bonds permitted Victim to live with him on a temporary basis after Victim's girlfriend (Girlfriend) kicked him out of her apartment. One evening, Bonds and his wife (Wife) left their two children with Wife's mother—who lived in the same apartment complex as they did—and went out with Victim and Girlfriend. The evening started with drinks at Girlfriend's aunt's house, and then the group decided to visit a bar in Salt Lake City, Utah. En route to the bar, they stopped at Bonds's apartment to smoke some marijuana, and continued to drink alcohol, having brought a bottle with them in the car.

¶3    Once the couples arrived at the bar, however, the evening began to turn sour. They encountered a man (Man) in the bar who had allegedly sexually assaulted Wife on a prior occasion. Bonds confronted Man about the incident, but Wife also argued with Bonds because she "was mad that [Bonds] didn't do anything in the first place." Meanwhile, Victim and Girlfriend were arguing in another section of the bar about some cocaine that Girlfriend had apparently lost. Eventually, Girlfriend and Wife tried to leave the bar without the men, but Bonds and

---

1. "We recite the facts in the light most favorable to the verdict, presenting conflicting evidence only as necessary to understand the issues on appeal." *State v. Salgado*, 2018 UT App 139, ¶ 2 n.1, 427 P.3d 1228.

Victim followed them outside. Victim thought Girlfriend was too intoxicated to drive, and expressed his opinion on the issue by punching the driver's side door of her car. Eventually, Bonds and Victim got into the car and the four of them drove off. Victim continued to vociferously opine that Girlfriend was too intoxicated to drive, and eventually Girlfriend pulled over to let Victim drive. At this point, Bonds began talking about going back to the bar to "get [Man]" and later speculated that they might "shoot up the bar" in the process.

¶4    Once they got back to Bonds's apartment, Bonds went inside to retrieve a gun, coming back outside with it before anyone else went inside. At this point Girlfriend wanted to go home, but Victim insisted on staying to "have his friend's back." When Bonds told Wife that he and Victim were going to go back to the bar, Girlfriend told Victim that, if he left with Bonds, she wanted nothing more to do with him. Neither woman felt threatened at this time, and they eventually went inside the apartment to have another drink, leaving the two men outside by themselves.

¶5    A few minutes later, around 2:00 a.m., the women heard gunshots outside. They heard first a single shot, then about a ten-second pause, then two or three more shots. Very shortly thereafter, Bonds came to the door of the apartment and told the women that he had just shot Victim; Bonds did not say anything more about any reason for the shooting, and did not offer additional details. Bonds then left the scene.

¶6    Girlfriend then ran outside and found Victim, a few buildings away within the same apartment complex, bleeding from a gunshot wound in his back. Victim was still conscious, and asked Girlfriend where Bonds was and said, "I can't believe he did this." A neighbor called the authorities and Victim was promptly taken to the hospital, where he died from his wounds at approximately 2:50 a.m. In addition to the gunshot wound in

his back, Victim had also been shot in the front of his arm, just below the elbow crease. According to autopsy results, Victim had a blood alcohol content of .141 and also tested positive for THC, the primary psychoactive ingredient in marijuana.

¶7     After leaving the scene, Bonds called a friend to ask for a ride, and in the course of the five-minute conversation, told him that he had just shot Victim, although he offered no reason why the shooting occurred. The friend thought Bonds seemed "drunk and high," and declined Bonds's request for a pick-up.

¶8     A few minutes later, at 2:17 a.m., police located Bonds at a convenience store and arrested him; during the course of the arrest, they found Bonds to be unarmed and compliant. Other than telling officers, while he was being arrested, that he did not have a gun on him, Bonds remained "pretty quiet" during his interactions with the officers, and the officers did not ask him any questions. By about 2:20 a.m., officers had transported Bonds to the police station and ushered him into a small interview room that contained a video camera; Bonds's entire experience in that room was recorded. Officers instructed Bonds to sit, handcuffed, in a chair in the corner of the room, and told him that someone would come soon to "talk to" him. But officers decided to first speak with both Wife and Girlfriend, and so it took them some time to get around to speaking with Bonds. As the hours ticked by, officers would occasionally come into the interview room to check on Bonds, sometimes loosening his cuffs or giving him water, and instructing him that he was to remain in the chair. Bonds attempted to sleep in the chair, but found it difficult to do so while handcuffed. At 5:55 a.m., officers escorted Bonds to a "break room" with a couch, where Bonds was able to sleep for about an hour. At about 7:00 a.m., officers brought Bonds back to the small interview room, and two detectives (Detectives) began interviewing Bonds at 7:07 a.m.

¶9    Before interviewing Bonds, officers had spoken with both Wife and Girlfriend, and although the record does not contain transcripts or video of those interviews, Detectives were aware of those witnesses' observations before interviewing Bonds. In addition to some of the facts recited above, Detectives were also aware that Bonds had at one point been diagnosed with bipolar disorder, even though he had not taken any medication for that condition in about a year. Detectives would later testify that they did not observe any signs of intoxication or mental illness in Bonds by the time they spoke with him, some five or six hours after he would have last consumed alcohol or drugs.

¶10    After getting basic contact information from Bonds and exchanging pleasantries, Detectives advised Bonds of his *Miranda*[2] rights and asked him if he understood those rights and whether he wished to talk to Detectives about the events of that past night. Bonds agreed to answer questions, and offered, as his initial version of events, that he "didn't do nothing to nobody" and that he had gotten into an altercation with Man at the bar but that was it. When first asked about his later encounter with Victim, Bonds stated that he "heard gunshots" but that he "was never around when the gunshots came around" and that the blood on him was not from the incident with Victim. Detectives did not believe Bonds's denial, and told Bonds that they had "talked to a lot of people" and that Bonds did not "know everything that we know." Bonds then stated that he and Victim had gotten into a fistfight at the bar, and that he and Victim had fought again outside his apartment, but continued to maintain that he had "no access to no gun at all" and that he had "been actually in the clean."

¶11    Detectives then told Bonds that they knew he had been in possession of a gun "because there's like at least three to four

---

2. *Miranda v. Arizona*, 384 U.S. 436, 468–69 (1966).

people that saw you with a gun out in front of your apartment tonight." Bonds continued to deny possession of any gun, and Detectives continued to press, telling Bonds that he needed "to start being honest and up front," and reiterating that people had seen him with a gun, had heard shots fired, and had "see[n] [Victim] get shot" by Bonds. Bonds appeared frustrated by these comments, questioning how anybody could have seen Victim get shot "when me and [Victim] was outside by our self," and telling Detectives that he knew his rights and that he knew what they were trying to do because his mother had previously been a deputy sheriff.

¶12 Detectives then took a different tack, softening their tone and telling Bonds that he seemed like a "nice guy and respectful and everything" and "it sounds like a mistake was made tonight," even implying that he might have been trying to protect Wife or his children. After Bonds shared with Detectives that he was a religious man, Detectives asked Bonds "what God would want [him] to do at this point" about "coming clean and everything else." In this same vein, Detectives told Bonds that Wife "wants you to do the right thing" and that his children would one day respect the fact that he had "manned up to it and he did the right thing afterwards."

¶13 Bonds then asked for a cigarette and asked Detectives "what am I facing?" Though Detectives knew at that point that Victim had died, they told Bonds that, as far as they knew, Victim was "in the hospital" and that they did not know any further details about "what happened and what's going on with him." After telling Detectives that "you all the coolest detectives I've ever met in my life in Utah," Bonds again stated that his mother had been a sheriff, and Detectives asked Bonds what he thought his mother would want him to do. After some additional back-and-forth, Bonds then made the following statement: "I don't know where that gun at man, but I did shoot [Victim] . . . ." Bonds stated that he "shot three shots," and that

the shooting occurred somewhere between his apartment and his mother-in-law's apartment.

¶14 After confessing to the shooting, Bonds offered additional details, giving Detectives a description of the gun, and telling Detectives that he gave the gun to Wife's mother after the shooting (an allegation his mother-in-law later denied; the gun was eventually found outside a neighboring apartment building, wrapped in a sweatshirt). Bonds described a scuffle between him and Victim where Victim attempted to grab the gun from him, the gun fell to the ground and discharged, and Bonds shot Victim as soon as he recovered the gun. According to Bonds, Victim had "said some crazy shit" during the altercation, including a threat to "shoot this whole house and these kids," a threat that Bonds claimed put him "in a rage" at Victim bringing his "kids in this," and causing him to vow that "nobody gonna hurt my kids."

¶15 Bonds was eventually charged with murder; felony discharge of a firearm with serious bodily injury; three counts of felony discharge of a firearm; and possession of a firearm by a restricted person. After some pretrial proceedings, Bonds filed a motion to suppress the statements he made during the interview, arguing that he was intoxicated to a degree that he did not understand his rights, and that his statements during his interview were involuntary and were the product of coercive police tactics. The trial court denied the motion, finding that Bonds knowingly and intelligently waived his rights, and that his confession was not coerced.

¶16 At trial, Bonds's counsel acknowledged to the jury that Bonds had indeed shot Victim, but argued that he acted in defense of himself and/or his Wife and children. In support of that defense, Bonds sought—and the court agreed to give— various instructions on self-defense, including instructions about imperfect self-defense and manslaughter. The instructions

specifically addressing self-defense and imperfect self-defense correctly stated that the State bore the burden of proving beyond a reasonable doubt that self-defense does not apply. But the separate instruction (Instruction No. 35) setting forth the elements of murder and manslaughter stated as follows:

> Before you can convict the Defendant, Christopher Bonds, of the lesser included offense of Manslaughter in Count 1 of the Information, you must find from all of the evidence and beyond a reasonable doubt each and every one of the following elements of that offense:
>
> * * *
>
> 1. Christopher Bonds;
>
> 2. Commits murder (See instruction no. 30)
>
> 3. but is found to having acted in accordance with an imperfect self defense. (See instruction no. 51)
>
> After you carefully consider all the evidence in this case, if you are convinced that each and every element has been proven, beyond a reasonable doubt, then you must find the defendant, GUILTY. On the other hand if you are not convinced that each and every element has been proven, beyond a reasonable doubt, then you must find the defendant NOT GUILTY.

¶17 At trial, the State presented testimony from Girlfriend and officers who responded to the scene. Bonds did not testify, but the State showed the jury a video recording of his interview with Detectives. In his cross-examination of Girlfriend, Bonds's counsel stressed that everyone was intoxicated and that Victim had been arguing, sometimes violently, with Girlfriend

throughout the night. In his closing argument, Bonds's counsel argued that Bonds acted in self-defense or imperfect self-defense, in order to protect his children from Victim, and specifically referred the jury to the instructions regarding self-defense. In its closing argument, the State acknowledged that, at the time of the shooting, Victim was running in the general direction of Bonds's mother-in-law's apartment, where Bonds's children were staying. The State also emphasized Bonds's silence while being arrested, noting that Bonds "said nothing . . . about defending himself and others," to arresting officers, and commenting that "common sense" would seem to dictate that someone who truly acted in self-defense would say something about self-defense while being arrested.

¶18 After deliberating, the jury convicted Bonds of murder, discharge of a firearm with serious bodily injury, and two counts of discharge of a firearm, but acquitted him on one count of discharge of a firearm. The jury also found that Bonds had been in possession of a gun on the night in question, and the court later found Bonds guilty of possession of a firearm by a restricted person, based on the jury's finding that Bonds had possessed a gun as well as the parties' stipulation that, due to a prior felony conviction, Bonds was a restricted person not allowed to possess one. The trial court later agreed to merge the discharge of a firearm conviction and the murder conviction. The court eventually sentenced Bonds to prison, to serve a term of fifteen years to life for the murder charge.

## ISSUES AND STANDARDS OF REVIEW

¶19 Bonds now appeals his convictions,[3] and raises two issues for our review. First, Bonds argues that the trial court erred

---

3. Although Bonds does not specifically so state, we do not construe Bonds's appeal as challenging his conviction for

(continued…)

when it admitted Bonds's statements from the police interview into evidence, and asserts that his confession was coerced. "The ultimate determination" of whether a confession was voluntary "is a legal question; accordingly, we review the district court's ruling for correctness. We set aside a district court's factual findings only if they are clearly erroneous." *State v. Rettenberger*, 1999 UT 80, ¶ 10, 984 P.2d 1009 (quotation simplified).[4] However, when the trial court's conclusion is based on a review of interrogation transcripts, "we are in as good a position as the district court to examine the transcripts and determine what the law is," and accordingly "we owe the district court no deference."[5] *State v. Arriaga-Luna*, 2013 UT 56, ¶ 8, 311 P.3d 1028.

---

(…continued)

possession of a firearm by a restricted person. None of the arguments Bonds advances on appeal involve issues relevant to that conviction. Moreover, neither at trial nor on appeal has Bonds contested the fact that he shot Victim, and Bonds stipulated that he was a restricted person for the purposes of the charge. Under the circumstances, we do not perceive any challenge to his conviction on this count.

4. Recently, our supreme court wondered whether correctness is truly the appropriate standard of review in cases in which a trial court has made a determination as to the voluntariness of a confession. *State v. Apodaca*, 2019 UT 54, ¶ 29 n.6. But the court stopped short of overruling the statement in *State v. Rettenberger*, 1999 UT 80, ¶ 10, 984 P.2d 1009, to that effect, *see Apodaca*, 2019 UT 54, ¶ 29 n.6, and therefore we consider that statement to be controlling.

5. In addition to reviewing the transcript of Bonds's interview with Detectives, we have also reviewed the entire video

(continued…)

¶20   Second, Bonds argues that his trial counsel provided ineffective assistance by (a) failing to object to the elements jury instruction that, in his view, improperly stated the burden of proof for imperfect self-defense, and (b) failing to object when the State elicited testimony regarding Bonds's post-arrest silence and then used that evidence to argue that Bonds must not have acted in self-defense. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (quotation simplified).

ANALYSIS

I.  Motion to Suppress Confession

¶21   "The due process clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution protect individuals from being compelled to incriminate themselves." *State v. Arriaga-Luna*, 2013 UT 56, ¶ 9, 311 P.3d 1028. This right protects only against "compulsory self-incrimination." *Michigan v. Tucker*, 417 U.S. 433, 439 (1974). Indeed, "those competent and freewilled to do so may give evidence against the whole world, themselves included." *United States v. Washington*, 431 U.S. 181, 187 (1977) (quotation simplified); *see also United States v. Monia*, 317 U.S. 424, 427 (1943) (stating that the Fifth Amendment "speaks of compulsion" and "does not preclude a witness from testifying voluntarily in matters which may incriminate him"); *State v. Piansiaksone*, 954 P.2d 861, 865 (Utah 1998) ("Admissions of guilt by wrongdoers, if not coerced, are inherently desirable."

(…continued)
recording of that interrogation, including the hours when Bonds was alone in the interview room.

(quotation simplified)). In this case, Bonds maintains that his confession was coerced, and that therefore its admission into evidence violated his constitutional rights.

¶22    In analyzing a defendant's claim that his confession was coerced, the overarching question that courts must answer is "'whether, considering the totality of the circumstances, the free will of the witness was overborne.'" *Arriaga-Luna*, 2013 UT 56, ¶ 9 (quoting *Washington*, 431 U.S. at 188). This analysis requires a court to look at all of the circumstances collectively; indeed, even in cases where "no one single issue or specific circumstance is egregious enough by itself to qualify as coercive," "coercion may still result from the cumulative effect of many relatively minor issues." *State v. Apodaca*, 2019 UT 54, ¶ 28 (quotation simplified).

¶23    In assessing the totality of the circumstances, courts must take into account "both the characteristics of the accused and the details of the interrogation." *Arriaga-Luna*, 2013 UT 56, ¶ 10 (quotation simplified). The "details of the interrogation" include "external factors, such as the duration of the interrogation, the persistence of the officers, police trickery, absence of family and counsel, and threats and promises made to the defendant by the officers." *Id.* (quotation simplified). The "characteristics of the accused" is a reference to "subjective" factors that "may affect [a witness's] susceptibility to more subtle forms of psychological persuasion," including "the defendant's mental health, mental deficiency, emotional instability, education, age, and familiarity with the judicial system." *Id.* (quotation simplified). Finally, for a confession to be involuntary, "there must be a causal relationship between the coercion and the subsequent confession." *Piansiaksone*, 954 P.2d at 865 (quotation simplified).

¶24    Bonds contends that both objective and subjective factors point toward a determination that his confession was unconstitutionally coerced. Although we agree with Bonds that Detectives' behavior in this case was not perfect, after examining

the totality of the circumstances presented, we are unpersuaded that Bonds's free will was overborne by Detectives' actions.

A.    Objective Factors

¶25    Bonds argues that some of Detectives' actions during the interrogation were improper and created an atmosphere of coercion. Specifically, Bonds asserts that Detectives "used threats and promises, the false friend technique, misrepresentations, isolation, and references to his family and religion." We examine these contentions in turn.

¶26    With regard to threats and promises, Bonds correctly points out that "an interrogation can be impermissibly coercive because it carried a threat of greater punishment or a promise for lesser punishment depending on whether a defendant confessed." *State v. Rettenberger*, 1999 UT 80, ¶ 29, 984 P.2d 1009 (quotation simplified). Bonds contends that Detectives used threats and promises to compel his confession by telling Bonds, among other things, that "you're gonna see your son" and that they would "put . . . in the[ir] report" the fact that Bonds had been cooperative. In our judgment, however, these statements cannot fairly be characterized as "implicit threats [that] can constitute psychological coercion and overcome a defendant's free will." *Arriaga-Luna*, 2013 UT 56, ¶ 17. At no point during the interview did Detectives ever convey to Bonds "a threat of greater punishment or a promise for lesser punishment depending on whether [he] confessed." *Rettenberger*, 1999 UT 80, ¶ 29 (quotation simplified). Indeed, Detectives did not tell Bonds what he was charged with until after he confessed to the shooting. And Detectives' statement about making a note in their report that Bonds had been cooperative was immediately followed by a statement by one of the Detectives that "I'm not promising anything so don't get me wrong." And in any event, a "mere representation to a defendant by officers that they will make known to the prosecutor and to the court that the

defendant cooperated with them" is not coercive. *Apodaca*, 2019 UT 54, ¶ 31 (quotation simplified). Moreover, Detectives' statement that Bonds would get to see his son was not unduly coercive; even jail inmates have visitation rights, and the statement was not accompanied by any promise of when, or under what circumstances, Bonds might get to see his son. In short, we do not construe the statements Bonds identifies as threats or promises, and certainly not as statements that were impermissibly coercive.

¶27     Bonds next contends that Detectives used the "false friend technique"—an interrogation tactic whereby officers represent "that they were [the suspect's] friends and that they were acting in his best interest," *see Rettenberger*, 1999 UT 80, ¶ 24—when they called him "bud" and "friend," and told him that they were trying to "be fair" and wanted to "give [Bonds] the chance to give [his] side of the story." We are not persuaded that Detectives' friendliness crossed the line into impropriety. Here, while Detectives were certainly friendly to and empathized with Bonds at several points, they never represented that they were acting in his best legal interests. Unlike in *Rettenberger*, *see id.* ¶¶ 27–28, there is no point in the interrogation where Bonds appears to believe that Detectives were trying to protect his interests, nor does he ever appear to go along with Detectives' version of events—indeed, as discussed below, he took issue with Detectives when they made claims about eyewitnesses that were not completely true. Moreover, the false friend technique, by itself, is not "sufficiently coercive to produce an involuntary confession." *Id.* ¶ 28. Rather, it merely "provides an environment in which other interrogation tactics may become coercive," *id.* and where "the suspect is fooled into trusting that the interrogator's behavior will conform to the norms of friendship," *id.* ¶ 24 (quotation simplified). Detectives created no such environment here. *See Apodaca*, 2019 UT 54, ¶ 38 (stating that, although officers clearly "tried to establish rapport with" the

suspect, their statements "simply demonstrate a desire to work with [the suspect] to solve the case" and were not coercive).

¶28    Bonds next complains that Detectives misrepresented the evidence that they had at their disposal. "[I]n certain cases, police misrepresentations may be sufficiently egregious to overcome a defendant's will so as to render a confession involuntary." *Rettenberger*, 1999 UT 80, ¶ 20. However, "a defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is." *Id.* (quotation simplified). In this case, Bonds's contention that Detectives made at least some misrepresentations of the facts is correct: in their questioning of Bonds, Detectives did embellish the information they had apparently been given from Wife and Girlfriend, and Detectives were less than forthcoming with Bonds about what they knew about Victim's condition. By the time they spoke with Bonds, police officers had already spoken with Wife and Girlfriend, who had seen him with a gun and identified him as the shooter. Detectives did not act improperly by weaving that information into the questions they put to Bonds. But Detectives went further than that: even though they had not yet talked to any other witnesses, and had not talked to anyone who actually saw Bonds shoot Victim, on several occasions during the interrogation they told Bonds that they had spoken with "at least three to four people that saw you with a gun out in front of your apartment tonight," and that there had been several eyewitnesses who actually saw Bonds shoot Victim. Detectives also told Bonds that they did not know the current status of Victim's condition, even though by that point they already knew that Victim had passed away, and that the case was potentially a murder case rather than an assault case.

¶29    Thus, the question with which we must contend is not whether Detectives made misrepresentations—they did—but whether those misrepresentations were "sufficiently egregious,"

*see id.*, to overcome Bonds's free will during the interview. On this record, while we do not condone Detectives' prevarications, we are not persuaded that Detectives' actions caused Bonds to render an involuntary confession. Our conclusion is driven by analysis of two cases: *Rettenberger* and *State v. Werner*, 2003 UT App 268, 76 P.3d 204.

¶30 In *Rettenberger*, the interrogating officers made no fewer than "36 false statements" while interviewing an eighteen-year-old suspect with a "maturity level of a fifteen-year-old" and a "below-average I.Q." 1999 UT 80, ¶¶ 21, 37. The "overwhelming majority" of the officers' misrepresentations "were not merely 'half-truths' but were complete fabrications about testimonial and physical evidence." *Id.* ¶ 21. Officers told the suspect that he was the subject of an undercover investigation, and that they had fingerprint, ballistic, and other physical evidence tying him to the scene as well as the testimony of "numerous eye-witnesses and co-defendants implicating him." *Id.* They also told him that they had "records of phone conversations incriminating him," that they "had found blood in his car," and that they had more evidence against him "than the police had in the O.J. Simpson case." *Id.* All of these statements were outright lies, and our supreme court determined that the officers had acted with "[e]xtreme duplicity." *Id.* ¶ 23. The court concluded that this behavior, viewed together with the totality of the circumstances presented, rendered involuntary the confession they eventually extracted. *Id.* ¶ 45.

¶31 In *Werner*, by contrast, the interviewing officers also made certain misrepresentations, but their exaggerations were not as egregious as those described in *Rettenberger*. In *Werner*, the interviewing officers told the suspect that "there was 'overwhelming evidence against him,'" and on two separate occasions told him they had a surveillance tape showing him at the scene, going as far as putting a blank video tape labeled "Mall Security of [Suspect] in the Parking Lot" in the

interrogation room. 2003 UT App 268, ¶ 30 & n.4. In our written opinion, this court was careful not to "condone the video tape hoax," but we noted that there was "significant other evidence of [the suspect's] guilt" that supported the officers' assertion that there existed "overwhelming evidence." *Id.* ¶¶ 30–32 (quotation simplified). After assessing the totality of the circumstances presented, we concluded that the officers' behavior was not "sufficiently egregious . . . so as to render [the] confession involuntary." *Id.* ¶ 32 (quotation simplified).

¶32　We find Detectives' misrepresentations to be far less egregious than those described in *Rettenberger*, and at least somewhat less egregious than those described in *Werner*. In this case, Detectives told Bonds that "at least three to four people . . . saw you with a gun," that there were eyewitnesses who saw Bonds shoot Victim, and that they did not know Victim's status. These statements were more like "half-truths," *Rettenberger*, 1999 UT 80, ¶ 21 (quotation simplified), than outright lies; indeed, officers had spoken to two people (although not "three to four") who saw Bonds with a gun, and although there were no eyewitnesses who saw Bonds shoot Victim, the witnesses on the scene had identified Bonds as the shooter. Moreover, while Detectives were not completely forthcoming with Bonds about Victim's condition, their falsehood was that they did not know Victim's condition; they made no affirmative misrepresentation that, for instance, Victim was fine and would fully recover. In addition, Bonds did not appear to be falling for Detectives' tricks; he challenged their representation about eyewitnesses seeing him shoot Victim, told them that he knew what they were up to because his mother had been a deputy sheriff, and appeared to become fairly uncooperative when confronted with the misrepresentations. Perhaps as a result, Detectives quickly changed course and did not repeat the statements. In our view, Detectives' actions—while perhaps falling short of exemplary police behavior—did not, in this case, cause Bonds's free will to be overborne or to render his confession involuntary.

¶33　Bonds next asserts that officers improperly subjected Bonds to "extended periods of incommunicado interrogation." *See Rettenberger*, 1999 UT 80, ¶ 33. In advancing this argument, Bonds relies on *Rettenberger*, in which the suspect was interrogated in seriatim fashion over a two-day period; the first interrogation lasted about "two hours," after which the suspect was "placed in solitary confinement where he spent approximately 22 hours with neither pillow nor blanket" and was not allowed, despite requests, to contact anyone, including his parents or his attorney, and then officers interrogated him a second time. *See id.* Bonds contends that his isolation in the interrogation room contributed to a coercive environment, but his isolation bears little resemblance to that in *Rettenberger*. In this case, Bonds was by himself for only five hours while Detectives got to the station and gathered other information; for one of these hours, Bonds was escorted into a "break room" where he was allowed to sleep on a couch. Our supreme court has made clear that "five to six hour interrogations are not in and of themselves coercive." *Apodaca*, 2019 UT 54, ¶ 42. Further, before confessing to the shooting, Bonds made no request to contact any other adult. While it may have been optimal for Detectives to have interviewed Bonds sooner, we cannot fault Detectives for wanting to speak with Wife and Girlfriend before speaking with Bonds, and we do not view the sequence of events that transpired in this case as unduly coercive.

¶34　Finally, Bonds faults Detectives for making appeals to his morality, family, and religion, and contends that those appeals created a coercive atmosphere. But "appeals to a defendant's sense of morality and responsibility are usually non-coercive," *Arriaga-Luna*, 2013 UT 56, ¶ 21, and we see nothing coercive about Detectives' appeals to Bonds's faith or his admiration for his mother, a retired sheriff's deputy. "The Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official

coercion." *Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010) (quotation simplified).

B.      Subjective Factors

¶35    Bonds also contends that various subjective factors regarding his personal circumstances contributed to a coercive environment during the interview. "[U]nder the totality of circumstances analysis, courts must also consider such factors as the defendant's mental health, mental deficiency, emotional instability, education, age, and familiarity with the judicial system." *Rettenberger*, 1999 UT 80, ¶ 15. Bonds argues that Detectives took advantage of these personal or subjective characteristics, thus making his interrogation coercive. We view the matter differently.

¶36    Bonds first asserts that Detectives were aware that he had been drinking heavily on the evening in question, and that Bonds described himself as "intoxicated" at the end of the interview. But according to Detectives, Bonds displayed no signs of being intoxicated or impaired, and our review of the interview video aligns with Detectives' observations. Indeed, by the time Detectives interviewed Bonds, it had been at least five or six hours since he had last consumed any intoxicating substance. There is simply insufficient evidence that Bonds was too intoxicated to give voluntary responses to Detectives' questions.

¶37    Bonds also contends that he was "exhausted" by the time Detectives interviewed him, and points out that he had obtained only fitful moments of sleep in the interview room, and then had one hour of presumably less-fitful sleep in the break room, and that by 7:00 a.m. he had essentially been up all night and was in no condition to speak with Detectives. We have no reason to doubt Bonds's contention that he was very tired. But, at least after the first minute or two of the interview, Bonds appears fully awake and alert and able to cogently respond to questions, and we find no evidence in the record to support the contention

that his fatigue was so severe that it led him to give answers to questions he would not have given in a more rested state.

¶38    Bonds points out that he had previously been diagnosed with bipolar disorder, and that mental illness is a factor that can lead to coercive interrogation. *See id.* ¶ 18 ("[A] confession may be suppressed in circumstances in which a police officer knows of a suspect's mental illness or deficiencies at the time of the interrogation and effectively exploits those weaknesses to obtain a confession."). But, as noted, Detectives saw no sign of any mental instability in Bonds during the interview, and Bonds acknowledges that he had not taken medication for his condition in over a year. On this record, Bonds has not persuaded us that his mental illness was severe enough to be exploitable by Detectives, or that Detectives exploited it in any event.

¶39    In this case, the actions of the police officers were not perfect. They could perhaps have moved Bonds from the interview room to the break room a bit sooner, to allow him to catch a bit more sleep. And they certainly could have—and should have—refrained from misrepresenting the evidence to Bonds by telling him that eyewitnesses had seen him shoot Victim, and that they did not know Victim's current condition. But on balance, after considering the totality of the circumstances surrounding Bonds's interrogation, *see Apodaca*, 2019 UT 54, ¶ 46, we are not persuaded that Bonds's free will was overborne. Accordingly, we conclude that the trial court did not err by denying Bonds's motion to suppress his confession.

## II. Ineffective Assistance of Counsel

¶40    Bonds next argues that his trial counsel rendered constitutionally ineffective assistance, in two respects: first, by failing to correct or object to the jury instruction that listed the elements of manslaughter, which misallocated the burden of proof regarding self-defense; and second, by failing to object to

statements made by the prosecution that may have had the effect of equating Bonds's silence with an admission of guilt.

¶41    In order to establish that his attorney provided ineffective assistance, Bonds must make a two-part showing: (1) that his attorney's "performance was deficient in that it fell below an objective standard of reasonableness," and (2) that his attorney's deficient performance was "prejudicial," meaning that "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Miller*, 2012 UT App 172, ¶ 9, 281 P.3d 282 (quotation simplified). We first address whether counsel performed deficiently, and then turn to the question of prejudice.

A.    Deficient Performance

¶42    To show deficient performance, a "defendant must overcome the strong presumption that his trial counsel rendered adequate assistance, by persuading the court that there was no conceivable tactical basis for counsel's actions." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (quotation simplified). "The defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland v. Washington*, 466 U.S. 668, 689 (1984) (quotation simplified). Because "[t]here are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way," *id.*, "only when no reasonable attorney would pursue the chosen strategy will we determine that counsel has been constitutionally ineffective," *State v. Roberts*, 2019 UT App 9, ¶ 29, 438 P.3d 885 (quotation simplified).

1

¶43    Bonds's first complaint about his attorney's performance is that his attorney failed to object to jury instructions that, collectively, spoke inconsistently about who bears the burden of

proof for self-defense. Specifically, Bonds directs our attention to Jury Instruction No. 35, which set forth the elements of the lesser included offense of manslaughter. As noted above, that instruction stated that, before the jury could convict Bonds of manslaughter, it needed to find "beyond a reasonable doubt" that Bonds "acted in accordance with an imperfect self defense." Bonds asserts—correctly—that this instruction misallocated the burden of proof with regard to self-defense.

¶44   Imperfect self-defense is a legal doctrine that, where applicable, operates to reduce a charge of murder to that of manslaughter, and applies when "the defendant caused the death of another . . . under a reasonable belief that the circumstances provided a legal justification or excuse for the conduct although the conduct was not legally justifiable or excusable under the existing circumstances." Utah Code Ann. § 76-5-203(4)(a) (LexisNexis 2017); *see also State v. Lee*, 2014 UT App 4, ¶ 38, 318 P.3d 1164 (Voros, J., concurring) ("If, under the facts as [the defendant] reasonably believed them to be, he reasonably but incorrectly believed his actions were legally justifiable, he acted in imperfect self-defense."). Imperfect self-defense differs from ordinary (or "perfect") self-defense in two primary respects: first, imperfect self-defense is only "a partial defense" that, where applicable, results only in reduction of a conviction from murder to manslaughter, whereas perfect self-defense "is a complete defense to any crime" that, where applicable, results in acquittal, *id.* ¶¶ 36–37; and second, "imperfect self-defense applies when a defendant makes a reasonable mistake of *law*," whereas "perfect self-defense applies when a defendant makes a reasonable mistake of *fact*," *id.* ¶ 41. For example, a defendant who "was entitled to defend himself" but was "not entitled to use deadly force" may avail himself of the imperfect self-defense doctrine regarding his use of deadly force, at least insofar as he can show that his belief regarding the necessity of deadly force was reasonable, even if legally incorrect. *See State v. Spillers*, 2005 UT App 283, ¶ 25, 116 P.3d

985, *aff'd*, 2007 UT 13, 152 P.3d 315; *see also Lee*, 2014 UT App 4, ¶ 44 (Voros, J., concurring) (stating that an imperfect self-defense instruction would have been available had the defendant been arguing "that he reasonably believed that the circumstances justified his use of lethal force when in fact they justified only his use of non-lethal force").

¶45 As with other self-defense doctrines, a criminal defendant is not obligated to prove that he acted in imperfect self-defense. Instead, "once a defendant has produced some evidence of imperfect self-defense, the prosecution is required to disprove imperfect self-defense beyond a reasonable doubt." *State v. Campos*, 2013 UT App 213, ¶ 38, 309 P.3d 1160. "Because the burden of proof for an affirmative defense is counterintuitive, instructions on affirmative defenses must clearly communicate to the jury what the burden of proof is and who carries the burden." *Lee*, 2014 UT App 4, ¶ 27 (quotation simplified).

¶46 Bonds contends that the jury instructions in this case, viewed collectively, gave the jury the wrong idea about who carried the burden of proof with regard to self-defense. Bonds acknowledges that both the general instruction about self-defense (Instruction No. 48), as well as the specific instruction about imperfect self-defense (Instruction No. 51), both got it right, clearly stating that "[t]he defendant is not required to prove" that "self-defense applies," and that it is the "State [that] must prove beyond a reasonable doubt that the defense does not apply." But Bonds correctly points out that the governing jury instruction setting forth the elements of manslaughter (Instruction No. 35) was not as clear, telling the jury that, before it could convict Bonds of the lesser included offense of manslaughter, it needed to find "beyond a reasonable doubt" that Bonds "acted in accordance with an imperfect self defense."

¶47 The State, with somewhat surprising vigor, attempts to defend this set of jury instructions, pointing out that both

Instructions No. 48 and No. 51 correctly allocated the burden of proof, and noting that Instruction No. 35—the troublesome one—contained an explicit cross-reference directing the jury to Instruction No. 51, and concluding that "the instructions read together accurately stated the law."

¶48   We might lend the State's argument more credence, had we not rejected nearly-identical arguments three times in recent years. *See State v. Garcia*, 2016 UT App 59, ¶¶ 14–16, 370 P.3d 970, *rev'd on alternate grounds*, 2017 UT 53, 424 P.3d 171; *Lee*, 2014 UT App 4, ¶¶ 26–27; *Campos*, 2013 UT App 213, ¶¶ 37–43. In *Campos*, the imperfect self-defense instruction itself correctly set forth the burden of proof, but the verdict form submitted to the jury required the jury to find "beyond a reasonable doubt, that the defense of Imperfect Self Defense applies in this case." 2013 UT App 213, ¶ 39 (emphasis omitted). We held that, despite the fact that the imperfect self-defense instruction "properly described the burden of proof," the instructions to the jury, taken as a whole, were erroneous, because "the verdict form directly contradicted that instruction by asking the jury to find either that the affirmative defense had been disproved beyond a reasonable doubt, or that it had been proved beyond a reasonable doubt." *Id.* ¶ 43 (emphasis omitted). In *Lee*, we were presented with an elements instruction nearly identical to the one at issue here, and we found the instructions improper. 2014 UT App 4, ¶ 27. And in *Garcia*, we were presented with a situation materially indistinguishable from this one, in which the imperfect self-defense instructions correctly allocated the burden of proof, but the elements instruction stated that "[b]efore you can find" the defendant guilty of manslaughter, "you must find beyond a reasonable doubt" that, among other things, "[t]he affirmative defense of imperfect-self defense does not apply." 2016 UT App 59, ¶ 14. We rejected the same argument the State makes here, stating that "dueling instructions—in conflict as to how the jury should consider the defense—cannot satisfy" the defendant's "entitlement to a correct instruction." *Id.* ¶ 16.

¶49 The State makes a last effort to defend the instructions here by referencing Instruction No. 35's explicit cross-reference to Instruction No. 51. While we acknowledge that the instructions in *Campos*, *Lee*, and *Garcia* had no such explicit cross-reference, we are unpersuaded that this distinction matters. Even without an explicit cross-reference, a jury that reads about imperfect self-defense in an elements instruction is likely to refer to the more specific instruction about imperfect self-defense. We are unpersuaded that the explicit cross-reference present in Instruction No. 35 is that much more effective than the implicit cross-references that were inherent in the instructions at issue in the other cases; at a minimum, we are unconvinced that this relatively minor factual difference is enough to render the other three cases inapplicable.[6]

---

6. The State also cites hopefully to *State v. Nelson*, 2015 UT 62, 355 P.3d 1031, where our supreme court stated that jury instructions that "could have been slightly more accurate or more complete" but are nonetheless accurate, are not erroneous. *Id.* ¶ 47. But this general language does not help the State here, because in *Nelson*, the jury instructions were not inaccurate, and certainly did not misstate the burden of proof. *See id.* ("[T]he instructions . . . directed the jury to reduce the relevant conviction by one degree if it found that the State had failed to disprove imperfect self-defense."). We have repeatedly held that "because the burden of proof required for affirmative defenses is counter-intuitive, the prosecution's responsibility should be made plain to the jury," *State v. Campos*, 2013 UT App 213, ¶ 42, 309 P.3d 1160 (quotation simplified), and have stated that "self-defense instructions . . . must clearly communicate to the jury what the burden of proof is *and* who carries the burden," *id.* (quotation simplified). Our supreme court had an opportunity, after *Nelson*, to weigh in on our *Campos*/*Lee*/*Garcia* line of cases when it reviewed the *Garcia* case, but it opted to reverse our decision in *Garcia* on alternative

(continued…)

¶50 But our conclusion that the jury instructions were erroneous does not necessarily mean that Bonds's attorney performed deficiently by failing to object to them. *See, e.g.*, *Strickland v. Washington*, 466 U.S. 668, 689 (1984) ("Even the best criminal defense attorneys would not defend a particular client in the same way."); *State v. Larrabee*, 2013 UT 70, ¶ 19, 321 P.3d 1136 ("If it can be shown that after thorough investigation of law and facts relevant to plausible options counsel made a strategic choice, then that choice is virtually unchallengeable." (quotation simplified)); *id.* ¶¶ 27–28 (stating that "under certain circumstances, strategically refusing to object is an acceptable trial strategy" and "it can be a legitimate strategy to remain silent due to a fear of prejudice"). If, for instance, Bonds's attorney had a strategic reason for wanting the jury instructions to contain that language, it would not necessarily be ineffective assistance for the attorney to fail to object. But in this case, the State mounts no argument (other than the one, rejected above, that the instructions are not erroneous) that a reasonable attorney might have elected to forgo an objection to these instructions, and in this situation we see no applicable strategic reason for Bonds's attorney to prefer erroneous and confusing jury instructions regarding the burden of proof germane to affirmative defenses. Indeed, we think that a reasonable attorney would have lodged an objection to those instructions, especially in light of our holdings in *Campos*, *Lee*, and *Garcia* that the attorneys in those cases had performed deficiently by failing to object in very similar situations. *See Garcia*, 2016 UT App 59, ¶ 21 (concluding that trial counsel "performed deficiently" by failing to object); *Lee*, 2014 UT App 4, ¶ 27 (stating that counsel has "a

_____

(…continued)

grounds, noting in passing that the jury instruction at issue in *Garcia* had indeed been incorrect. *State v. Garcia*, 2017 UT 53, ¶ 23 n.5, 424 P.3d 171. In short, we do not view the court's statement in *Nelson* as at odds with our rulings in *Campos*, *Lee*, and *Garcia*.

duty to object to such a fundamentally flawed instruction and to ensure that the jury was properly instructed on the correct burden of proof," and concluding that trial counsel "performed deficiently in failing to object"); *Campos*, 2013 UT App 213, ¶ 45 ("[T]rial counsel's failure to object to the verdict form fell below an objective standard of reasonableness.").

¶51 In short, we conclude that the jury instructions, taken together, misstated the burden of proof applicable to Bonds's affirmative defense of imperfect self-defense, and that trial counsel performed deficiently by failing to object to them.[7]

2

¶52 Bonds's next complaint about his attorney's performance is that the attorney failed to object to the State's argument that, if Bonds had truly acted in self-defense, he would have said so to

---

7. During oral argument before this court, counsel for the State chided us for never having set forth, in our previous decisions, an elements jury instruction for manslaughter in an imperfect self-defense situation that *would* pass muster. In response, we note simply that it is our task to review instructions given by trial judges in particular cases, not to draft or suggest new ones for general use by the bench and bar. Indeed, ably-staffed committees of lawyers and judges have already been formed for that purpose, and one of those committees recently generated suggested instructions and a proposed verdict form that may cover this situation. *See* Model Utah Jury Instructions 2d CR1411, CR1450, CR1451, CR 1452, SVF 1450 (Advisory Committee on the Model Utah Criminal Jury Instructions 2018), https://www.ut courts.gov/resources/muji/ [https://perma.cc/2UA6-GDQN]. We have, of course, not yet been asked to weigh in on the propriety of those instructions and verdict form, and they are not at issue in this appeal.

the officers who arrested him at the convenience store at 2:17 a.m. Bonds asserts that the introduction of this evidence, and the State's use of it at trial, infringed on his Fifth Amendment right against self-incrimination.

¶53    "Generally, the prosecution may not refer to or elicit testimony concerning a defendant's post-arrest silence." *State v. Reyes*, 861 P.2d 1055, 1057 n.2 (Utah Ct. App. 1993); *see also Mitchell v. United States*, 526 U.S. 314, 330 (1999) (stating that the Fifth Amendment protections against compulsory self-incrimination prohibit "an inference of guilt from a defendant's rightful silence"). The State makes little effort to defend the propriety of its own trial tactics in this regard, acknowledging that, had Bonds's trial counsel lodged an objection to the State's introduction of this evidence, "[c]ounsel may very well have been able to keep the officer's testimony on the subject out."

¶54    But the State does contend that Bonds's trial counsel may have had strategic reasons for not objecting to the officer's testimony about Bonds's post-arrest silence. The State notes that Bonds had three post-shooting encounters with people ((i) his conversation with Wife and Girlfriend immediately after the shooting; (ii) his telephone conversation with his friend; and (iii) his encounter with the arresting officers at the convenience store), and in none of those encounters did Bonds say anything about having shot Victim in self-defense. The State therefore posits that Bonds's attorney was "still facing the prospect of explaining why [Bonds] said nothing about defending his family to two other witnesses," and therefore could reasonably have determined, for strategic reasons, to address the matter through the officer's testimony.

¶55    We find the State's argument unconvincing. As Bonds correctly points out, the other two conversations were with civilians, not with police, and consisted of very short

discussions. It is a lot easier to explain why Bonds did not mention self-defense to the friend he called to ask for a ride than it is to explain why Bonds did not mention to arresting officers—who have the ability to deprive him of his freedom—that he had some justification for shooting Victim. And it is a lot easier to explain why Bonds did not mention self-defense on two occasions than it is to explain why he did not mention it on three occasions. The State does not explain why it would have been better, from a strategic perspective, to address the issue through the arresting officer's testimony rather than through Girlfriend's testimony or through the friend's testimony. We are unable to discern any reason why reasonable counsel would have failed to object to the arresting officer's testimony about Bonds's silence, and we think a reasonable attorney would have done so. Accordingly, we conclude that Bonds's attorney performed deficiently by failing to object to introduction of that evidence.

B.     Prejudice

¶56     Because we have determined that Bonds's trial attorney rendered deficient performance in two particular respects, we must now turn to the question of whether the attorney's deficient performance prejudiced Bonds. Deficient performance is prejudicial to a defendant only when "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Miller*, 2012 UT App 172, ¶ 9, 281 P.3d 282 (quotation simplified). In this context, the "'reasonable probability' standard" is less exacting than "the more demanding 'more likely than not' standard." *Tillman v. State*, 2005 UT 56, ¶ 29 n.7, 128 P.3d 1123 (quoting *Strickler v. Greene*, 527 U.S. 263, 297–300 (1999) (Souter, J., concurring and dissenting)), *superseded in part by statute on other grounds as stated in Gordon v. State*, 2016 UT App 190, 382 P.3d 1063. The reasonable probability standard is "more akin to a 'significant possibility' of a different result." *Id.* (quotation simplified). There is a "reasonable probability of a different

result" when a court's "confidence in the outcome of the trial" is undermined. *Id.* ¶ 29 (quotation simplified); *see also Strickland v. Washington*, 466 U.S. 668, 694 (1984) ("A reasonable probability is a probability sufficient to undermine confidence in the outcome."). In this case, because we have identified two instances of deficient performance, we analyze the prejudice issue in cumulative fashion, *see State v. Campos*, 2013 UT App 213, ¶ 61, 309 P.3d 1160 (applying "the doctrine of cumulative prejudice" in a similar situation), with the relevant overarching question being this one: if the jury had been instructed correctly as to the burden of proof regarding self-defense, and if it had not heard the officer's testimony and the prosecutor's argument about Bonds's silence while being arrested, is there a significant possibility that the result of the trial would have been different?

¶57 The State asserts that we can answer this question in the negative, because "the evidence against [Bonds] was overwhelming," and because the facts of this case do not support any claim of self-defense, whether perfect or imperfect. While the evidence supporting Bonds's self-defense claim is hardly crystal clear, in our judgment there is sufficient evidence of self-defense to cause us significant unease about the role counsel's decisions might have played in the outcome of the trial.[8]

¶58 In his interview with Detectives, Bonds described a scuffle between him and Victim where Victim attempted to grab the gun from Bonds, the gun fell to the ground and discharged, and Bonds shot Victim as soon as he recovered the gun. As Bonds

---

8. We note some strategic tension between Bonds's two arguments on appeal. The best evidence supporting Bonds's claim of self-defense came from Bonds's own interview with Detectives. Had Bonds succeeded in suppressing the interview, the evidence supporting a self-defense claim would have been extremely scant.

described it, Victim "said some crazy shit" during the altercation, and specifically threatened to "shoot this whole house and these kids." Bonds told police that Victim's threats to his family caused Bonds to become enraged and to vow that "nobody gonna hurt my kids." Certainly, a credible threat that someone is planning to shoot a person's children can give that person reason to defend against that threat. Indeed, the jury in this case was instructed—in an instruction to which no one objected—that "[a] person is justified in threatening or using force against another when and to the extent that the person reasonably believes that force or a threat of force is necessary to defend the person *or a third person* against another person's imminent use of unlawful force." (Emphasis added.)

¶59    The State asserts, however, that the evidence cannot support a determination that Bonds's self-defense belief was reasonable. The State correctly points out that Bonds had already wrested the gun away from Victim by the time Bonds shot him, and that Bonds shot Victim in the back, indicating that Bonds himself was not at that point under any credible threat from Victim. And the State asserts that there is no evidence to support the notion that Victim was running toward either Bonds's apartment (where Wife and Girlfriend were) or toward Bonds's mother-in-law's apartment (where Bonds's children were).

¶60    But the State overstates it. We agree with the State that the evidence on this point is far from clear; indeed, the fullest description of Victim's behavior at the time of the shooting comes from Bonds's own statement to police that Victim was running "towards the back like where the apartments is at, like where the parking at, where the trash can is at." While the record contains a map of the apartment complex and its surroundings, there are no markings on the map indicating where Victim was when he was shot or the direction Victim was running. From our review of the trial transcript, it appears that the State had each witness reference the map using a laser

pointer (rather than a pen or marker), leaving no clear record for us to review on appeal. But Bonds's statement could be interpreted to mean that Victim was running toward "where the apartments is at," and the State's current position on appeal—that there is no evidence to support the notion that Victim was running toward one of the apartments—is belied by the prosecutor's statement during closing argument that he was "not going to dispute" that Victim "ran in [the] direction" of mother-in-law's apartment. Moreover, even if the State were correct, and there really were no evidence that Victim was running toward the apartments, Bonds shot him before he had been able to run more than a few feet, and we think it perilous to ascribe too much weight to the apparent direction of Victim's movement.

¶61 The State also sensibly points out that, after Bonds successfully won the struggle for the gun, Victim had no other weapon and was unarmed, and therefore was not at that point capable of shooting Bonds's children as he had allegedly threatened to do. But even a person without a gun is capable of visiting great harm upon children, and Bonds may have reasonably believed that Victim, despite no longer having possession of a gun, still might harm his children.

¶62 And this is where imperfect self-defense comes into play. In situations where an individual reasonably believes that he needs to defend himself or others, but may not have been entitled to use deadly force in so doing, we have determined that imperfect self-defense is available. *See State v. Spillers*, 2005 UT App 283, ¶ 25, 116 P.3d 985 (stating that, where the evidence supported "an interpretation that [Spillers] was entitled to defend himself . . . but not entitled to use deadly force," the defendant was entitled to argue imperfect self-defense), *aff'd*, 2007 UT 13, 152 P.3d 315; *Lee*, 2014 UT App 4, ¶ 41 (Voros, J., concurring) ("We learn from *Spillers* that a defendant is entitled to an instruction on imperfect self-defense if a jury could conclude from the evidence that he reasonably but incorrectly

believed he was justified in using lethal force against a non-lethal attack."). In addition, Bonds may also have made a different legal error: as his attorney stated at oral argument before this court, Bonds may have believed that Victim presented a threat to his children, if not necessarily an immediate one, and could have incorrectly (but reasonably) believed that he was justified in using immediate force to stop a non-immediate threat.

¶63    In this case, Bonds had some decent (if not totally convincing) arguments regarding self-defense, and specifically regarding imperfect self-defense. In a situation like this, the instructions regarding the burden of proof on self-defense issues might have mattered. It is certainly a lot easier for a jury to conclude that self-defense has not been established beyond a reasonable doubt than it is for a jury to determine that the State has disproven self-defense beyond any reasonable doubt. And the additional evidence about Bonds's silence upon being arrested—while probably not prejudicial on its own—constituted another improper item on the State's side of the ledger. It is also worth noting that, in this case, the jury deliberated for over ten hours, and acquitted Bonds of one felonious discharge of a firearm count, perhaps indicating that it credited his account of how the first shot was fired. *See State v. Richardson*, 2013 UT 50, ¶ 44, 308 P.3d 526 (reasoning that a split verdict can be an indication that "the jury was conflicted about the evidence," and that therefore errors committed during trial might have made a difference).

¶64    In the end, we conclude that a reasonable probability exists that, had the jury received proper instructions and had the State's inference of guilt from Bonds's silence been kept from the jury, the jury's decision regarding self-defense and manslaughter may have been different and, accordingly, our confidence in the outcome has been undermined. Both errors went to the strength of Bonds's self-defense argument. Therefore, we conclude that,

on the record before us, Bonds was prejudiced by his attorney's deficient performance.

CONCLUSION

¶65    The trial court did not err in denying Bonds's motion to suppress the police interview, in which he confessed to shooting Victim but claimed to have done so in defense of his children. But Bonds's trial attorney rendered ineffective assistance by failing to object to an incorrect and inconsistent set of jury instructions, and by failing to object to introduction and use of evidence about Bonds's silence while being arrested, and we have sufficient unease about the prejudicial effect of these errors to justify a new trial. Accordingly, we reverse all of Bonds's convictions—except for his conviction for possession of a firearm by a restricted person, which Bonds does not challenge here— and remand this matter for a new trial.

————