**2022 UT App 41**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ANDY PHILLIPS CABUTUTAN,
Appellant.

Opinion
No. 20200151-CA
Filed March 31, 2022

Eighth District Court, Vernal Department
The Honorable Edwin T. Peterson
No. 181800504

Aaron P. Dodd and Kara H. North,
Attorneys for Appellant

Sean D. Reyes and Jonathan S. Bauer,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

MORTENSEN, Judge:

¶1     Andy Phillips Cabututan's fight with his boss (Boss) started with words, a pistol, swinging fists, a kick to the groin, and a brick; but the fight ended with Boss's death after Cabututan struck Boss's head with a shovel. At Cabututan's murder trial, the jury rejected his assertion that he acted in perfect self-defense and ultimately convicted him of the lesser included offense of manslaughter. Cabututan appeals on various grounds, but we affirm.

BACKGROUND[1]

¶2      At a time when Cabututan and Boss maintained a good relationship, Cabututan moved his camper onto Boss's property as part of an agreement to perform mechanical work on Boss's taxis. However, as the months passed, their relationship soured. Cabututan, in Boss's view, had failed to live up to his end of the bargain—namely, Cabututan sat in his camper instead of working on the taxis.

¶3      One morning, while Cabututan sat in his camper, he heard a sudden bang on his door. Boss had come to confront Cabututan about Cabututan's failure to do enough work. After opening the camper door, Cabututan walked past Boss, opened the door to his van and got in, and, leaving the van door open, began rolling a cigarette. For a moment, Cabututan listened as Boss "yell[ed] and scream[ed]," but he soon informed Boss that he would be moving. In response, Boss challenged him, "Come on out of there and we'll handle this."

¶4      So, as Cabututan told the police, he "stepped up to him," "[t]ook off [his] shirt[,] and came at him." But almost immediately, Boss produced a pistol. Cabututan, seeing a loaded pistol pointed straight at him, "just went into complete blank out self-defense mode," "took a swing at [Boss], and blocked . . . the pistol." Boss lowered the pistol and Cabututan jumped to the side before seeing Boss raise the pistol again. Cabututan reacted quickly and "kicked [Boss] square in the nuts," but to Cabututan's surprise, "it didn't even [faze] him. He still had the pistol in his hand." When Boss raised the pistol again, Cabututan

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611.

"just started dancing" and "moving around"—all amidst "a bunch of screaming" from both of them.

¶5    Eventually, Boss "reached down and picked up [a] brick," giving him "two weapons in his hand[s]" while Cabututan had none. But then Cabututan saw a shovel lying on the ground. Cabututan picked it up and swung it at Boss, but Boss "ducked to the side." Boss raised the pistol in one hand and had the brick "up ready to throw." Thinking that Boss would throw the brick, Cabututan swung the shovel again. Boss side-stepped and started to raise the pistol again, but Cabututan struck him with the shovel on the side of the head and he "dropped," falling "face first." Cabututan threw the shovel, "kind of freaked out and walked [away] and came back."

¶6    From her living-room window, Boss's wife (Wife) saw Cabututan "walking around, holding his head." When she went outside to find out what was going on, Cabututan told her that Boss "came after [him]" and pointed toward where Boss's body lay on the ground, face down. She then called 911, and Cabututan attempted to perform CPR. Despite these efforts, and the efforts of police and medical professionals, Boss died. At the scene, Cabututan provided police a statement detailing the fight's progression as described above, and later, the State charged Cabututan with murder.

¶7    At trial, defense counsel opted to pursue a theory of self-defense and conceded that Boss had died by Cabututan's hand, stating, "We all know [how Boss died]. He died—he got hit in the head with a shovel." Defense counsel, however, did object to several photos depicting both the autopsy and the crime scene. The autopsy photos showed a skull, with the scalp skinned back to reveal the internal injuries that resulted from the hit with the shovel. In defense counsel's estimation, the prejudicial impact to the jury far outweighed any probative impact that could result from the photos' admission; he asserted that the jury would just

see "a morbid, blood[y], skinned back[] skull." The trial court, however, disagreed, stating that because "the State is going to be proving up the cause of death and the degree of force that caused the death . . . the probative value of these [photos] outweigh[ed] the prejudicial value in that" the photos went toward "the degree of force that was exerted that would have caused the demise of the individual." As for the crime scene photos, the court determined that they depicted the external injury and the spatial relationship between where the body, the brick, and the pistol were found on the scene. Defense counsel objected to these photos on grounds that they "sensationalized" the on-scene treatment to elicit sympathy from the jury. But, except for one photo excluded because it was "redundant," the court allowed the photos, in part, because they "show[ed] the alleged injury," as well as "a lot of other things that the State deem[ed] relevant" but that the court did not expressly identify.

¶8     In addition to testimony about the fight as described above, the State elicited testimony from Wife about how she experienced the incident, and when asked how the incident had affected her, she responded, "It's changed my whole life. I've lost everything. I even lost my dog. He died. I mean, [I] lost my financial [security] that I had before, where I'm having to work just to survive now." And later, the State elicited testimony from the medical examiner who conducted the autopsy. The medical examiner described the autopsy photos and testified that he determined the "manner of death" was—as a medical and not a legal matter—"homicide" due to "blunt head trauma."

¶9     Following the State's case, Cabututan moved for a directed verdict. He asserted that the State had failed to carry its burden of proving that his affirmative defense of "perfect self-defense" did not apply. In response, the State argued that it had "provided sufficient evidence that the jury could find that the defendant [was] in fact guilty of murder and that in fact self-defense [did] not apply." The State asserted that the instructions

would "state that if [Cabututan] . . . was engaged [in] combat by agreement," then perfect self-defense would not apply. And by Cabututan's "own words" combat by agreement was "exactly what happened, and the jury could so find." The court agreed and denied the motion.

¶10 The jury instructions informed the jury that to find Cabututan guilty of murder, it would have to agree on each of the elements of murder and that perfect self-defense did not apply. The jury was also instructed that if it found him guilty of murder, it would have to determine whether imperfect self-defense applied. The jury was informed that imperfect self-defense was a "partial defense" to murder, that it applied "when the defendant caused the death of another while incorrectly, but reasonably, believing that his conduct was legally justified or excused," and that its effect would be "to reduce the level of the offense." Ultimately—whether due to a determination that only imperfect self-defense applied or because it did not believe that the State had proved the elements of murder—the jury found Cabututan guilty of the lesser included offense of manslaughter.

ISSUES AND STANDARDS OF REVIEW

¶11 Cabututan now appeals and raises three primary issues for our review. First, he contends that the State presented insufficient evidence to overcome his claim of perfect self-defense. "When reviewing a preserved sufficiency of the evidence claim, we ask simply whether the jury's verdict is reasonable in light of all of the evidence taken cumulatively, under a standard of review that yields deference to all reasonable inferences supporting the jury's verdict." *State v. Darnstaedt*, 2021 UT App 19, ¶ 18, 483 P.3d 71 (cleaned up). Second, Cabututan contends that the trial court erred in admitting the photos. We review such challenges to the admission of evidence for an abuse of discretion. *Met v. State*, 2016 UT 51, ¶ 36, 388 P.3d 447. Third, Cabututan contends that

defense counsel rendered ineffective assistance by failing to object to testimony about the effect of Boss's death on Wife.[2] "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Beckering*, 2015 UT App 53, ¶ 18, 346 P.3d 672 (cleaned up).

## ANALYSIS

### I. Sufficiency of the Evidence

¶12 To prevail on his contention that the State presented insufficient evidence to overcome his assertion of perfect self-defense, Cabututan would need to show either that, given the evidence presented at trial, a jury could not "find, beyond a reasonable doubt, that the defendant committed the crime," *see State v. Henfling*, 2020 UT App 129, ¶ 28, 474 P.3d 994 (cleaned up), or that perfect self-defense did not apply. But this is something Cabututan cannot do because his own statements provided the evidence necessary for the State to meet its burden

---

2. Cabututan also alleges that his counsel performed ineffectively by failing to object to a medical examiner's testimony. This contention stems from his concession that Boss died from a wound he inflicted with the shovel. According to Cabututan, because he conceded the cause of Boss's death, the jury did not need to hear the medical examiner's testimony, and allowing the testimony without objection paved the path for the State to admit the allegedly gruesome autopsy photos. However, as we will describe, the court did not abuse its discretion in admitting the autopsy photos. Thus, Cabututan's ineffective assistance of counsel claim related to the medical examiner's testimony, which is contingent on the inadmissibility of the autopsy photos, falls short, and we do not discuss it further.

to show guilt and disprove perfect self-defense beyond a reasonable doubt.

¶13 Under Utah self-defense law, "[a]n individual is justified in using force intended or likely to cause death or serious bodily injury only if the individual reasonably believes that force is necessary to prevent death or serious bodily injury to the individual . . . as a result of imminent use of unlawful force." Utah Code Ann. § 76-2-402(2)(b) (LexisNexis Supp. 2021). But,

> [a]n individual is not justified in using force . . . if the individual . . . was the aggressor or was engaged in a combat by agreement, unless the individual withdraws from the encounter and effectively communicates to the other individual the intent to withdraw from the encounter and, notwithstanding, the other individual continues or threatens to continue the use of unlawful force.

*Id.* § 76-2-402(3)(a)(iii). This brand of self-defense is known as "perfect self-defense." *See State v. Bonds*, 2019 UT App 156, ¶ 44, 450 P.3d 120, *cert. granted on other grounds*, 466 P.3d 1072 (Utah 2020). However, even in the absence of legally justified perfect self-defense,

> [i]t is an affirmative defense to a charge of murder or attempted murder that the defendant caused the death of another or attempted to cause the death of another under a reasonable belief that the circumstances provided a legal justification or excuse for the conduct although the conduct was not legally justifiable or excusable under the existing circumstances.

Utah Code Ann. § 76-5-203(4)(a) (LexisNexis 2017). This brand of self-defense is known as "imperfect self-defense." *Bonds*, 2019 UT App 156, ¶ 44.

¶14 "Where applicable, [imperfect self-defense] results only in reduction of a conviction from murder to manslaughter, whereas perfect self-defense is a complete defense to any crime that, where applicable, results in acquittal . . . ." *Id.* (cleaned up). And, as with any affirmative defense, an assertion of self-defense, be it perfect or imperfect, places the burden on the prosecution to "disprove" that defense "once a defendant has produced some evidence of" it. *Id.* ¶ 45 (cleaned up); *see also State v. Garcia*, 2001 UT App 19, ¶¶ 1, 16, 18 P.3d 1123 (identifying self-defense as an affirmative defense); *State v. Drej*, 2010 UT 35, ¶ 15, 233 P.3d 476 ("The Utah rule requires that the prosecution disprove the existence of affirmative defenses beyond a reasonable doubt once the defendant has produced some evidence of the defense." (cleaned up)).

¶15 Cabututan contends that the State failed to present sufficient evidence to overcome his assertion of perfect self-defense and that, accordingly, the trial court erred in denying his motion for a directed verdict and allowing the case to proceed to the jury. However, the entire evidentiary picture before the jury refutes that contention.

¶16 At trial, the State pointed out that the jury had heard in Cabututan's "own words" that he had "engaged [in] combat by agreement." Specifically, the jury heard from Cabututan that when Boss challenged him, he "stepped up to" the challenge, "[t]ook off [his] shirt[,] and came at" Boss. There was no evidence that, at any point, Cabututan attempted to withdraw from the encounter. Based on these facts, the jury could reasonably find that Cabututan participated in the fight by mutual agreement and at no point did he "withdraw[] from the encounter and effectively communicate[]" that "intent to withdraw." *See* Utah Code Ann. § 76-2-402(3)(a)(iii). Far from requiring the court to direct the verdict in Cabututan's favor, the evidence presented to the jury provided ample space for the jury to reject Cabututan's assertion that he acted in perfect self-

defense and enter a conviction. Accordingly, we reject his claim that the evidence was insufficient to support a jury verdict of manslaughter.

## II. Admission of the Photos

¶17    To prevail on his contention that the trial court abused its discretion in admitting the photos over his objection, Cabututan must demonstrate that the court applied "the wrong legal standard or" rendered a decision "beyond the limits of reasonability." *See Met v. State*, 2016 UT 51, ¶ 96, 388 P.3d 447 (cleaned up). Here, that means that Cabututan must demonstrate that the court abused its discretion in determining that the photos passed muster under rule 403 of the Utah Rules of Evidence, *see id.* ¶ 83—i.e., that the photos' "potential for unfair prejudice" did not "substantially outweigh[]" their "probative value," *id.* ¶ 89; *see also* Utah R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . .").

¶18    Below, the court determined that the autopsy photos' probative value was not outweighed by unfair prejudice. Probative value existed, it ruled, because the State would "be proving up the cause of death and the degree of force that caused the death." And it concluded that any potential prejudice would be ameliorated because the court required that the State clarify for the jury that the autopsy photos were "not representative of the condition of the individual prior to" "opening the skull up" during autopsy. Similarly, the court determined that the crime scene photos warranted admission because, rather than sensationalize the crime scene, they "show[ed] the alleged injury" and the spatial relationship of the body, the brick, and the pistol.

¶19    On appeal, Cabututan has not persuaded us that the court's ruling constituted an abuse of discretion. Rather, we agree with the State that although Cabututan admitted to killing

Boss with the shovel, the photos could still assist the jury in determining that Cabututan had the requisite intent to commit the crime charged. Furthermore, the photos might also have been useful in assessing Cabututan's self-defense claim and how it correlated with the degree of force he used when he hit Boss with the shovel. Put simply, the photos and the injury they showed could have helped the jury determine the way Cabututan used the shovel and whether he wielded it for only defensive parries or to inflict a substantial blow. Moreover, we do not believe the jury would have ascribed the condition of Boss's body in the autopsy photos to the circumstances of the fight. Indeed, to prevent this possibility, the court specifically instructed the State to—and the State actually did—inform the jury that the autopsy (and not Cabututan) was to blame for any apparent gruesomeness. Further, as to the crime scene photos, we agree with the court's apparent view that seeing "the alleged injury" and the spatial relationship of the body, the brick, and the pistol could assist the jury in making its determination. And finally, having reviewed the photos ourselves, we do not perceive the photos as unfairly gruesome or disturbing. Accordingly, we conclude that the court did not abuse its discretion in admitting the photos.

### III. Ineffective Assistance of Counsel

¶20    To prevail on his claim of ineffective assistance of counsel, Cabututan must show not only that defense counsel performed deficiently but also that any deficient performance "prejudiced the defense." *See State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350 (cleaned up). In other words, Cabututan would have to show "a reasonable probability" that "absent counsel's error," "the outcome of his . . . case would have been different." *Id.* ¶ 43. And because "a defendant must satisfy both parts of this test[,] . . . if we determine that a defendant has made an insufficient showing on one [component]," we need not address the other. *State v. Whytock*, 2020 UT App 107, ¶ 26, 469 P.3d 1150 (cleaned up).

¶21 Cabututan's contention that defense counsel rendered ineffective assistance fails for a lack of prejudice. Cabututan contends that defense counsel rendered ineffective assistance by failing to object when Wife testified, among other things, that Boss's death had "changed [her] whole life." Specifically, he argues that the testimony elicited undue sympathy from the jury. But we disagree that Wife's statements were reasonably likely to have had any material impact on the outcome of this case. Although Wife's testimony delved into specific details the jury might not have known otherwise, the overarching message from Wife's testimony—that her life had radically changed since Boss's death and that she now faced financial difficulty—was something the jury would have discerned regardless, and we see no reasonable probability that this particular testimony tipped the scales away from acquittal and toward a conviction of manslaughter for a death Cabututan admitted to causing.

¶22 More fundamentally, a lack of prejudice in this case also results from the fact that even without the contested testimony, the jury heard evidence from Cabututan that he willingly participated in the fight—an admission that undermined his perfect self-defense theory and, as discussed, created at least a question for the jury. *See supra* Part I. And given the fact that Cabututan conceded that he hit Boss with the shovel and that the blow resulted in his death, Cabututan would have to show that the failure to object to the contested testimony was the reason that the jury granted him the second-best outcome for his case—a conviction for manslaughter—as opposed to the best outcome for his case—an acquittal resulting from a finding of perfect self-defense. Under the circumstances presented here, even if defense counsel had objected to the contested testimony and the court had excluded it, such a change in the evidentiary landscape would not have altered the robust evidence that when Boss challenged Cabututan, Cabututan "stepped up to" the challenge, "[t]ook off [his] shirt[,] and came at" Boss and that he never backed down from the fight. Accordingly, it is not reasonably

likely that Wife's testimony had any appreciable effect on the jury applying the statutory framework providing that a person who is engaged "in a combat by agreement" is, by law, not eligible for the protection of perfect self-defense, unless he communicates an intent to withdraw from the encounter and the other individual continues to engage in the attack. *See* Utah Code Ann. § 76-2-402(3)(a)(iii) (LexisNexis Supp. 2021). Thus, Cabututan's ineffective assistance claim fails for lack of prejudice.

## CONCLUSION

¶23 Because sufficient evidence existed for the State to overcome its burden of showing that perfect self-defense did not apply, because the court did not abuse its discretion in admitting the photos, and because Cabututan cannot show ineffective assistance, we affirm Cabututan's conviction.

_____