2022 UT App 89

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BRONSON JOSEPH FLYNN,
Appellant.

Opinion
No. 20200685-CA
Filed July 14, 2022

Fifth District Court, St. George Department
The Honorable G. Michael Westfall
No. 181502732

Gary W. Pendleton, Attorney for Appellant

Sean D. Reyes and David A. Simpson,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion, in which JUDGE RYAN D. TENNEY and JUSTICE DIANA HAGEN concurred.[1]

CHRISTIANSEN FORSTER, Judge:

¶1     Following his conviction for murder, Bronson Joseph Flynn filed a motion for new trial, alleging that he had received ineffective assistance of counsel. The district court denied Flynn's motion, and Flynn appeals that denial. We affirm.

---

1. Justice Diana Hagen began her work on this case as a judge of the Utah Court of Appeals. She became a member of the Utah Supreme Court thereafter and completed her work on the case sitting by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 3-108(4).

BACKGROUND

¶2     Flynn was outside a bar in St. George, Utah, when he was approached by Spencer Tafua. The two exchanged heated words, and Tafua threw several punches at Flynn, at least one of which landed, causing Flynn to fall to the ground. Flynn retreated while Tafua's friends restrained Tafua. At this point, Flynn was "[a]fraid" and "[o]verwhelmed." A friend walked Flynn to the parking lot and then returned to the bar.

¶3     According to Flynn, four men, including Tafua, followed him to the parking lot, while "screaming at" him. He heard one of the men threaten that he would "kill" him and another tell somebody to "grab your strap."[2] Flynn estimated that the men were five to ten feet away from him. Flynn ran to his car but had trouble opening the front passenger side door. He "look[ed] back towards the bar" and saw "a group kind of coalescing and moving towards [him] in the parking lot aisle." "That's when [he] decided to arm [himself]." Flynn retrieved his rifle from the back seat of the car, walked around to the driver side about "five" or "seven" feet from the car, and chambered a live round. He thought the gun "would be a deterrent enough to keep people from continuing to move toward [him]." But the group, which was "probably 30 to 40 feet" away at that point, kept coming toward him.

¶4     Some witnesses testified that it was Flynn who came back toward the bar with his rifle in hand.[3] One heard him yell, "Come

_____

2. Flynn interpreted "strap" to mean "gun," and another witness confirmed that "strap" was "slang for gun."

3. Numerous witnesses testified at trial regarding the initial altercation and the events that followed it. Each witness presented a slightly different perspective, and there were some variations in their testimonies. As this case does not concern issues relating to

(continued…)

fight me now. You think you're so tough now." And another heard him "mouthing off."

¶5    Flynn "pulled the action again to cause that live round to fly out" to "show them it was loaded." He warned, "Everybody back up or I'll shoot." However, several individuals continued to move toward him. Flynn felt "panicked that they weren't responding" by backing away. According to Flynn, one of the men—Tafua's brother (Brother)—"lunge[d] for the gun." Flynn again yelled at the group to "[b]ack up." Tafua then lunged for the gun. Flynn "stepped onto the curb to try to put a little distance between them and [him]." Brother again lunged for the gun and fell.[4] At this point, Flynn "took the safety off . . . because [he] was boxed in and panicked." Tafua and three others stepped over Brother and kept "moving towards" Flynn while Flynn was "screaming at the top of [his] lungs" for them to "[b]ack up." Flynn felt "[s]cared" and backed up several more steps. He then "planted [his] feet" and warned, "You come any closer, I'll shoot you." At that point, Tafua lunged for the gun one last time, and Flynn shot him in the chest, killing him. Flynn then "ran back to [his] car" and everyone else "backed off."

¶6    The State charged Flynn with murder and various other offenses. Prior to trial, the State offered Flynn a plea deal that would have allowed him to plead guilty to a charge of manslaughter based on "imperfect self-defense and/or the

---

the sufficiency of the evidence and we do not reach the prejudice prong of the ineffective assistance of counsel analysis, *see infra* ¶ 13, we refrain from a full discussion of the testimony for the sake of brevity. Suffice it to say that there was evidence to support both the State's and Flynn's versions of events.

4. Brother did not admit to lunging for the gun but testified that he tripped or was "pushed down" by the other people in the group.

extreme emotional distress defense." However, defense counsel advised Flynn to reject the offer because, in counsel's opinion, "even if the jury did not believe that [he] had acted in self-defense, a manslaughter conviction was 'a reasonable worst-case scenario.'" Flynn rejected the plea offer, "believing" that if the jury rejected his perfect self-defense argument, it "would consider the mitigating circumstances that would . . . reduce the murder charge to manslaughter."

¶7     Ultimately, defense counsel did not ask the court to instruct the jury on lesser-included offenses. However, the State requested instructions on the lesser-included offense of manslaughter based on recklessness or imperfect self-defense. The court adopted the requested instructions on the lesser-included offense. The court did not instruct the jury on extreme emotional distress.

¶8     During its cross-examination of Flynn, the State suggested that rather than shoot Tafua, Flynn could have run away, fought with his fists, asked the security guards for help, called 911, fired a warning shot into the air, or shot Tafua in the arm or leg rather than the chest. During closing argument, the State reemphasized several of these options.

¶9     In his closing argument, defense counsel started out by emphasizing to the jury, "[W]e have a right to defend ourselves. We don't have to just let someone beat the tar out of us. We have a right to defend ourselves . . . with legal force if necessary." Counsel then went on to discuss all the efforts Flynn took to retreat and the fact that he did not shoot Tafua until after he had deliberately warned the approaching group several times to stay away from him:

> [W]hen exactly did [Flynn] stand his ground? Did he stand his ground at the smoking area? Did he stand his ground at the entrance of the bar? Did he

stand his ground halfway down when they were following him? Did he stand his ground as he chased?

So at this point . . . in his car he didn't go any further . . . , and that's when he did see these people coming, that's when he did pull out his rifle. Then let's go further than that, because they kept advancing on him. Even after he racked it, even after he said, "Don't come any closer or I'll shoot," they still kept coming. Did [Flynn] shoot anyone then? Did [Flynn] stand his ground? No. [Flynn] tried to get up into the area between his car and another car through the empty parking stall. He wasn't even standing his ground then, and that's when somebody tried to grab the gun for the first time.

Then he gets to the sidewalk, he turns around to face the enemy. Let's be clear, this group of people in that moment were his enemy. Not by Mr. Flynn's choice. Then they come closer. . . .

. . . . [Then Brother either] tried to grab the gun . . . [or tripped and Flynn] misconstrued that as him reaching for the gun. But did [Flynn] shoot [Brother]? Did he shoot them right then? No, he didn't.

. . . .

He says that he walked down a few feet away from his car. . . . Then he turned around, and this is where he stood his ground. . . . After being pursued once, twice, three times, four, five, six, seven times, this is where . . . Flynn stood his ground, and he . . . yelled, "Don't come any closer, stay away from me. Don't come any closer or I'll shoot." . . . .

> [Tafua] also advanced that 10 to 20 feet towards [Flynn], after he warned him don't come any closer or I'll shoot, and [Tafua] took his first step closer. Did [Flynn] shoot? How about the second step, did [Flynn] shoot? How about the third step? Did [Flynn] shoot? . . . . No, [Flynn] waited.
>
> . . . . [Flynn] waited to fire that gun . . . . One to two feet, [Tafua] is right there. That's how long [Flynn] waited to fire that rifle. Do you really think that [Flynn] wanted to kill [Tafua]?

Defense counsel then responded to the State's suggestions about alternative solutions Flynn could have employed: "[The State] brought up yesterday all those suggestions that Mr. Flynn could have done. Well, I'm going to go through these scenarios too." Defense counsel then recited all the times Tafua and his friends could have backed off rather than cornering Flynn and opined that, had they done so, "[Tafua] would still be alive today." Counsel then continued,

> [Flynn] didn't have time to think. [Flynn] didn't have time to strategize and think you know what, maybe I came off a little rough. Maybe I should have . . . you know, told a joke. No. No.
>
> . . . . [T]ime and time again he had distanced himself. After time and time again he had communicated his desire to withdraw from the engagement. He didn't have time.

Counsel then continued,

> Now I want to briefly talk about the lesser includeds. I'm not going to go through them, but the reason I have focused so much on self defense is because that is the first hurdle that the State needs

> to overcome. You must be convinced beyond a reasonable doubt that . . . Flynn was not acting in self defense that night.
>
> If . . . you make that conclusion, if you find that he was acting in self defense, I want to caution you about the lesser includeds. . . . [I]t's the State that introduced those lesser includeds. It's not me, it's not the Court, it's the State.
>
> I don't want you tempted. If you have been convinced beyond a reasonable doubt that he was acting in . . . self defense, I don't want you tempted by the lesser includeds . . . .

Counsel then related the biblical story of King Solomon, in which King Solomon resolved two women's dispute over which of them was the true mother of a baby by proposing to cut the child in two, with each woman receiving half. The true mother was willing to give the baby to the false mother rather than see it killed. Counsel analogized this story to Flynn's situation, explaining, "[S]plitting that baby would not have been justice. If you . . . believe that my client acted in self defense, a lesser included would be splitting the baby."

¶10   The jury deliberated for several hours and eventually sent a note to the court indicating that the jurors could not reach an agreement about whether murder should be reduced to manslaughter on a theory of imperfect self-defense. The court asked the jury to continue deliberating, and the jury eventually returned with a guilty verdict on the murder charge.

¶11   Flynn filed a motion for new trial, asserting that he received ineffective assistance of counsel because defense counsel did not ask for a special mitigation instruction based on a claim of extreme emotional distress. The court denied Flynn's motion,

reasoning that counsel was not ineffective because objectively reasonable counsel could have concluded that the evidence was not strong enough to support an extreme emotional distress claim and that such a claim could undermine his self-defense claim. Flynn now appeals.

## ISSUE AND STANDARD OF REVIEW

¶12    Flynn asserts that defense counsel performed ineffectively by failing to request a jury instruction on extreme emotional distress. "Where a trial court has heard a motion based on ineffectiveness of counsel and that court's ruling is up for review on appeal, we afford the trial court's conclusions no deference and review them for correctness, but we set aside its factual findings only if they are clearly erroneous." *State v. Martinez*, 2020 UT App 69, ¶ 25, 464 P.3d 1170 (quotation simplified).

## ANALYSIS

¶13    To prevail on his claim, Flynn "must demonstrate that (1) his counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense." *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871 (quotation simplified). "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address a defendant's claims under either prong." *State v. Torres*, 2018 UT App 113, ¶ 14, 427 P.3d 550 (quotation simplified). Here, we address only the first prong of the ineffective assistance inquiry—deficient performance.

¶14    "The performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Ray*, 2020 UT 12, ¶ 31 (quotation simplified). "If it appears counsel's

actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance." *Id.* ¶ 34. In making this assessment, a court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)), and "[e]very effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time," *State v. Tippetts*, 2021 UT App 137, ¶ 28, 501 P.3d 570 (second alteration in original) (quoting *Strickland*, 466 U.S. at 689).

¶15 The use of deadly force in self-defense is justified when the defendant "reasonably believes that force is necessary to prevent death or serious bodily injury to the person or a third person as a result of another person's imminent use of unlawful force, or to prevent the commission of a forcible felony." Utah Code Ann. § 76-2-402(1)(b) (LexisNexis 2017). "Perfect self-defense requires that a defendant's belief that force is necessary be both reasonable and legally justified." *State v. Silva*, 2019 UT 36, ¶ 29, 456 P.3d 718. It is a complete defense that precludes a conviction for murder or manslaughter. Utah Code Ann. § 76-2-402(1)(b); *see also State v. Bonds*, 2019 UT App 156, ¶ 44, 450 P.3d 120 ("Perfect self-defense is a complete defense to any crime that, where applicable, results in acquittal." (quotation simplified)), *aff'd in part, rev'd in part*, 2022 UT 30. Imperfect self-defense applies where the jury finds that the defendant had "a reasonable belief that the circumstances provided a legal justification or excuse for the conduct although the conduct was not legally justifiable or excusable under the existing circumstances." Utah Code Ann. § 76-5-203(4)(a) (LexisNexis 2017). Imperfect self-defense reduces the murder charge to manslaughter. *Id.* § 76-5-203(4)(c)(i). Because both perfect self-defense and imperfect self-defense are affirmative defenses that negate an element of the offense, the State must

disprove them beyond a reasonable doubt. *Bonds*, 2019 UT App 156, ¶ 45. Thus, to find either perfect self-defense or imperfect self-defense, the jury was required to find that the State failed to disprove that Flynn reasonably believed that using deadly force was necessary to protect himself from death or serious harm.

¶16 Under the version of the statute in effect at the time of the events in this case,[5] a finding of extreme emotional distress required proof that the defendant acted "under the influence of extreme emotional distress for which there is a reasonable explanation or excuse." Utah Code Ann. § 76-5-205.5(1)(b) (LexisNexis 2012). Like a finding of imperfect self-defense, a finding of extreme emotional distress reduces a murder conviction to manslaughter. *Id.* § 76-5-205.5(5)(b)(iii). However, it is the defendant's burden to prove extreme emotional distress by a preponderance of the evidence. *Id.* § 76-5-205.5(5)(a). Extreme emotional distress has both an objective component and a subjective component. *State v. Sanchez*, 2018 UT 31, ¶ 36, 422 P.3d 866. The objective component requires proof that the distress was such that "a reasonable person's self-control and ability to make a rational choice would be overwhelmingly and substantially undermined." *Id.* ¶ 45 (quotation simplified). The subjective component requires proof that the defendant's "extreme emotional reaction caused a loss of self-control and that his or her reason was overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation, or other similar emotions." *Id.* ¶ 41 (quotation simplified).

¶17 The State maintains that "counsel made a deliberate strategic choice to eschew lesser-included offenses and to pursue an 'all-or-nothing' strategy" and that "counsel could reasonably

---

5. The "extreme emotional distress" mitigation defense is still available, but the relevant section has been significantly amended. *Compare* Utah Code Ann. § 76-5-205.5 (LexisNexis 2012), *with id.* (Supp. 2021).

decide" that asking for an extreme emotional distress instruction "would detract from his strategy." The district court agreed that "[o]bjectively reasonable trial counsel could strategize to rely solely on [Flynn's] claim of self-defense and not raise an extreme emotional distress argument because it would undermine [Flynn's] claim that he was deliberately standing his ground." We agree.

¶18    "A defendant is entitled to a jury instruction on a lesser included offense, so long as the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit [them] of the greater."[6] *State v. Hull*, 2017 UT App 233, ¶ 15, 414 P.3d 526 (quotation simplified). "However, even when there is a basis for a lesser-included-offense instruction, counsel can reasonably decide not to request one." *Id.* ¶ 16. "This is because, depending on the facts of a particular case, counsel may have perfectly valid tactical reasons to forgo the instruction and to instead present an all or nothing defense that entails avoiding a lesser-included offense instruction in the hopes the jury will find the defendant totally innocent of any wrongdoing." *Id.* (quotation simplified). We must therefore consider whether "in the circumstances of this case, trial counsel could have reasonably decided not to have the jury instructed" regarding extreme

---

6. Flynn spends a good portion of his briefing arguing that he was entitled to request that the jury be instructed on extreme emotional distress, and the State counters that a reasonable attorney could have concluded that Flynn's testimony at trial did not show that he was so overwhelmed by emotions that he lost control of his actions. Because the threshold level of evidence required for a special mitigation instruction is low and we ultimately determine that counsel's decision to pursue a complete acquittal was reasonable, *see infra* ¶ 28, we assume without deciding that Flynn would have been entitled to such an instruction had he requested one.

emotional distress, and "[w]e will conclude that counsel's performance was deficient only if it can be said that no objectively competent attorney would have" made that decision. *See id.* ¶ 17.

¶19 "[C]ounsel does not perform deficiently by failing to request a lesser included offense instruction that is inconsistent with the defense presented at trial." *State v. Powell*, 2020 UT App 63, ¶ 43, 463 P.3d 705. And although self-defense and extreme emotional distress may be "asserted together," they are at least "arguably inconsistent," and counsel may make a strategic decision not to pursue both defenses. *State v. Campos*, 2013 UT App 213, ¶¶ 35–36, 309 P.3d 1160. Because of "the heavy measure of deference we apply to counsel's judgments," "pursuing one middle-ground defense and choosing to [forgo] another that was arguably inconsistent with [the defendant's] version of events" is not unreasonable. *Id.* ¶ 36 (quotation simplified).

¶20 Flynn attempts to distinguish *Campos* by asserting that *Campos* "involved [a] strategic decision[] to avoid an [extreme emotional distress] strategy altogether," whereas counsel in this case "developed evidence that supported a theory of extreme emotional distress and repeatedly elicited testimony from Flynn concerning his highly emotional state and the circumstances giving rise to Flynn's distress." Flynn asserts that "counsel never advanced a theory of mitigation by arguing that Flynn had reasonably believed that he was legally justified or excused" and instead "argued that Flynn had been overwhelmed by circumstance and had not had time for reflective thought." He further asserts that counsel's arguments that Flynn's fear and stress had "deprived him of 'time to think, . . . time to strategize'" undermined the argument that Flynn acted reasonably, as required for the jury to find perfect self-defense or imperfect self-defense. We do not consider this to be a fair reading of the evidence counsel elicited or the arguments he advanced.

¶21    First, we think Flynn has overstated the significance of counsel's statements that Flynn "didn't have time to think," "didn't have time to strategize," and "didn't have time." Read in context, these statements actually appear to be a response to the State's suggestion that there were other reasonable actions Flynn could have taken, such as calling 911, getting help from a security guard, or firing a warning shot. Thus, counsel appears to have made the statements to help demonstrate the reasonableness of Flynn's belief that deadly force was necessary to protect himself.

¶22    We also disagree with Flynn's assertion that counsel did not argue that Flynn reasonably believed he was legally justified or excused. In fact, counsel focused extensively on the reasonableness of Flynn's actions. He elicited evidence indicating that after having been physically assaulted, Flynn was followed and verbally threatened with deadly force by a group of men. In closing argument, he walked the jury through Flynn's actions and all the attempts he made to retreat and to get Tafua and his friends to leave him alone. He emphasized Flynn's delay before shooting Tafua and his multiple verbal warnings for the group to stay away from him and not come any closer. He also detailed the aggressions of Tafua and his friends toward Flynn.

¶23    While defense counsel also elicited isolated statements from Flynn that he was "afraid," "overwhelmed," "boxed in," and "panicked," these statements alone do not suggest that counsel was setting up an extreme emotional distress defense. And in fact, counsel made no argument either that these emotions were so strong as to make a reasonable person lose self-control or that Flynn was personally so overwhelmed by his emotions that he lost self-control or the ability to reason. Nor did Flynn testify that his emotions overcame his reason. To the contrary, Flynn recalled his actions in great detail and explained his thought process and reasoning as he took each step. For example, he retrieved the gun from the car because he "thought it would be a deterrent enough

to keep people from continuing to move toward" him. He "pulled the action again to cause that live round to fly out" to "show them it was loaded." He took steps backward "to try to put a little distance between" himself and the group. He made multiple verbal warnings to the group to back up and leave him alone without firing any shots. He explained at trial that the reason he did not call 911 was that he believed there was an "imminent threat at that moment" and police would not respond quickly enough to help him. And when he finally shot Tafua, he did so "because [Tafua] was trying to grab [Flynn's] gun."

¶24   In short, we do not agree with Flynn's characterization of the evidence and defense counsel's strategy. Counsel elected to focus on perfect self-defense, and with the jury having been instructed on "one middle-ground defense" of imperfect self-defense, counsel chose "to [forgo] another that was arguably inconsistent with" his chosen defense. *See Campos*, 2013 UT App 213, ¶ 36 (quotation simplified).

¶25   Flynn nevertheless asserts that "counsel did not and could not have reasonably advanced an all-or-nothing trial strategy" because "counsel had advised Flynn to reject the State's plea offer because counsel considered a manslaughter conviction to be a reasonable worst-case scenario." But defense counsel did not allow the murder charge to go to the jury without *any* instruction on the lesser-included offense of manslaughter. Although defense counsel was not the one to request the lesser-included offense instruction, the jury was instructed on imperfect self-defense and given the opportunity to convict Flynn of manslaughter based on imperfect self-defense. In fact, by leaving it to the State to request this instruction, defense counsel was able to get Flynn the benefit of an imperfect self-defense instruction while also adamantly maintaining that Flynn should be acquitted based on perfect self-defense. Counsel was able to tell the jury, "[I]t's the State that introduced those lesser includeds. It's not me, it's not the Court, it's the State." And counsel used the fact to his advantage by

likening Flynn to the mother in the King Solomon story who was willing to give up her baby rather than see it killed—suggesting that Flynn so genuinely believed that he was acting in self-defense that he was willing to risk a murder conviction.

¶26 If counsel instead had to advocate for a manslaughter conviction based on extreme emotional distress, it could have easily undermined his adamant declaration that Flynn was acting in self-defense and should be acquitted. Since the State requested the instruction on the lesser-included offense, defense counsel was able to argue his self-defense theory to the fullest extent while still allowing the jury the middle-ground option of convicting Flynn of manslaughter if it concluded that Flynn's conduct was not legally justified.

¶27 Furthermore, counsel could have reasonably concluded that the jury was more likely to accept the affirmative defense of imperfect self-defense than to find mitigation based on extreme emotional distress. First, the evidence supporting imperfect self-defense was consistent with his principal theory of perfect self-defense and was much stronger than the evidence of extreme emotional distress. There was little, if any, evidence to suggest that Flynn experienced a loss of self-control or that the circumstances were such that a reasonable person would have lost control. Instead, evidence regarding the confrontation and Flynn's own testimony regarding his state of mind tended to support the defense theory that Flynn reasonably believed that lethal force was necessary to protect himself. Second, the burden of proof on the extreme emotional distress claim was higher, as the State was required to disprove imperfect self-defense beyond a reasonable doubt, while Flynn would have had to prove extreme emotional distress by a preponderance of the evidence.

¶28 It is not a stretch to determine that reasonable counsel, having considered all these factors, would conclude that it was

better to forgo the extreme emotional distress instruction and focus on a self-defense strategy.

## CONCLUSION

¶29 Because counsel's decision to forgo an extreme emotional distress instruction was a reasonable strategic decision, we are not convinced that counsel performed deficiently. Accordingly, we affirm Flynn's conviction.

——————