**2025 UT App 116**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
OMAR CORTEZ-IZARRARAZ,
Appellant.

Opinion
No. 20220352-CA
Filed July 25, 2025

Third District Court, Salt Lake Department
The Honorable Richard McKelvie
No. 201907555

Freyja Johnson, Hannah K. Leavitt-Howell, and
Heather Ellison, Attorneys for Appellant

Derek E. Brown and Jonathan S. Bauer,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER
and RYAN D. TENNEY concurred.

HARRIS, Judge:

¶1     A jury convicted Omar Cortez-Izarraraz (Cortez) of seven counts of felony discharge of a firearm and one count of obstruction of justice. He appeals his convictions, asserting that his trial attorney rendered constitutionally ineffective assistance in various respects. We reject Cortez's arguments and affirm his convictions.

## BACKGROUND[1]

### *The Shooting*

¶2 One summer evening, Cortez and a friend (Friend) went to a house party. One of the party hostesses had an older brother, Nate,[2] who was also at the party. At some point in the evening, an altercation took place between Nate and Friend. During the altercation, Nate slapped Friend and told him to leave the party on foot. Nate then told Cortez, "I had to slap your homie. You might want to go pick him up because I made him walk home." Cortez and some of his other friends "were really mad" that Nate slapped Friend, and as they were leaving, Nate "didn't know if they were going to fight [him] or jump" him. But no fight occurred at that point, and Cortez left the party.

¶3 Over the next hour or so, the party dwindled, and all the partygoers left except Nate, Nate's sister, and "a couple of" other women. Thinking the party was over, Nate locked the front door and stayed in the living room, "chilling" and "drinking." At some point, Nate heard a knock on the door, and he answered it. It was Cortez and Friend. Nate asked Cortez what was going on, and after some words, Cortez approached Nate, grabbed his shoulder, and said, "You sure you want to do this?" Nate then shoved Cortez's hand off his shoulder, and Cortez "pulled [a gun] out and started shooting." In all, Cortez fired seven shots, three of which hit Nate, striking him in the elbow, back, and pelvis. Nate fell to

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly." *State v. Popp*, 2019 UT App 173, n.1, 453 P.3d 657 (cleaned up). In so doing, "we present conflicting evidence only when necessary to understand issues raised on appeal." *Id.* (cleaned up).

2. A pseudonym.

the ground and lost consciousness. He woke up in the hospital two weeks later; he survived, but he ended up being hospitalized for about three months.

¶4     Law enforcement officers later found Cortez at his home, and when they executed a search warrant, they found a gun box and holster. The lead investigator (Detective) interviewed Cortez, who initially denied being at the party and even knowing Friend. Cortez had gotten "rid of" the gun and later told a cellmate that he had thrown it in a river.

¶5     The State eventually charged Cortez with seven counts of felony discharge of a firearm. Three of those counts were charged as first-degree felonies and concerned the three shots that actually struck Nate; the other four counts were charged as third-degree felonies and concerned the shots that missed. The State also charged Cortez with one count of obstruction of justice, a second-degree felony, for disposing of the gun.

*Jury Selection*

¶6     Before trial began, the court sent questionnaires to potential jurors to assess whether they had any biases that could unduly affect their judgment in the case; these questionnaires were to be completed under penalty of perjury. One of the potential jurors (Juror 6) disclosed in the questionnaire that he had "[p]articipated in controlled substance buys with the Salt Lake County Sheriff's Department" and had been "called to testify in court on a few instances about [a] sting operation." In response to a question about whether he was related to, or was close friends with, any prosecutors or law enforcement officers, Juror 6 stated that he was "involved" in the law enforcement community and that he worked in "Safety (Security)/EMS" where he was "in charge of hiring all off duty" law enforcement officers. He further stated that he had "close friendships" with officers from various local police departments. Another potential juror (Juror 7) disclosed on the questionnaire that his "[b]rother was a chief of

police and [his] father is a retired police officer" and that he knew "many police officers and federal agents." Both Juror 6 and Juror 7, however, affirmed in the questionnaire that they would "not give more or less weight to the testimony of a law enforcement officer just because they are an officer." And when asked if there was "any reason [they] could not serve as . . . fair and impartial juror[s]," both answered in the negative.

¶7     On the first day of trial, during the jury selection process, the court engaged in further questioning of the potential jurors. When the court asked if any jurors might know one or more of the police witnesses identified by the State, Jurors 6 and 7 both raised their hands. Juror 6 told the court that he was "familiar with law enforcement officers" because he worked with them "hand in hand." He stated that some of the police officer witnesses sounded familiar to him but that he could not recall whether he knew them individually. Juror 6 explained that he worked with "off duty police officers" and "hired them to work with [him]." Juror 6 also stated that he had "very good friends that [were] police officers throughout the state" and that he had worked with officers from several local police departments.

¶8     When the court asked Juror 7 whether he knew the police witnesses in the case, Juror 7 responded that he didn't "know any of them specifically." And when the court later inquired further about his relationships with law enforcement officers, Juror 7 explained that his father was a retired police officer and his brother was a retired police lieutenant and former police chief. Later, the court asked jurors to raise their hands if they "would give more or less weight to the testimony of a police officer merely by virtue of the fact that he or she is a law enforcement officer," and neither Juror 6 nor Juror 7 raised their hands.

¶9     After the court's questioning had concluded, Cortez's attorney (Counsel) moved to strike Juror 6 for cause, noting that Juror 6 had been "involved in undercover activity" on behalf of

police and asserting that Juror 6 had "connections with law enforcement almost to a degree that make him law enforcement." Counsel noted that Juror 6 had indicated he could be fair and impartial, but Counsel expressed doubt about that statement, arguing that Juror 6's "inability to even recognize . . . a hint of that bias" was itself "questionable." The court denied the challenge, explaining that there is no per se rule that would prohibit members of any particular profession, including law enforcement, from sitting on juries. The court noted that Juror 6 had indicated that he would not be biased, and it stated that, "in absence of any overt expression of bias," it was "not going to infer any bias based" merely on Juror 6's relationships with police officers. Cortez did not make a for-cause objection to Juror 7, and he did not use a peremptory challenge to strike Juror 6 or Juror 7; both were eventually impaneled.

*The Trial*

¶10 After that, the trial—which lasted for three days—began in earnest, and the State presented its case-in-chief, calling as witnesses Nate, Nate's sister, several partygoers, three police officers, two detectives, and the trauma surgeon who treated Nate, all of whom testified about the events described above.

¶11 During Nate's testimony, he described his interaction with Cortez after Cortez returned to the house with Friend. Nate testified that he "already knew" there would be trouble when he opened the door to find Cortez and Friend. Nate stated that he always carried a knife on his person, including on the night of the party, but that during the incident, he did not take the knife out or threaten anyone with it. He testified that when he took Cortez's hand off his shoulder, "it was all bad after that," and he offered his impression that Cortez "emptied the whole clip" at him.

¶12 On cross-examination, Nate testified that he had been drinking at the party and had been "sloppy drunk" that night.

When Counsel asked Nate whether Cortez seemed sober throughout the evening, Nate provided the following testimony:

> [Nate]: Yeah, I think so, you mean. I can't tell you because I don't remember. I wasn't keeping track of him, but.
>
> [Counsel]: Right.
>
> [Nate]: But I think he was on probation or something, you mean, because I smoke weed, you know.
>
> [Counsel]: Okay.
>
> [Nate]: And I mean I was offering and I don't think I remember him smoking and I think that's why that give me, oh, yeah, he can't drink or, I mean, I'm not sure though, you mean.
>
> [Counsel]: Sure. Okay.
>
> [Nate]: I'm not 100 percent.
>
> [Counsel]: But what I'm getting at, it's a party environment?
>
> [Nate]: Yeah.

Counsel did not object or move to strike Nate's reference to Cortez possibly being "on probation or something" as a reason he had not been drinking or smoking at the party.

¶13 Several police officers testified. One officer testified about treating Nate's wounds at the scene. He testified that Nate's hands were empty and that he did not see any weapon on Nate's person. Another officer testified that he did not see a knife when he searched the area for shell casings. A third officer testified about

receiving a bag from hospital staff containing "items that [Nate] had with him" when he arrived at the hospital. These items included bloody shorts and a folding knife in the closed position, with dried blood on the handle but not on the blade.

¶14 Detective testified about his investigation of the case. He described identifying Cortez as a suspect in Nate's shooting based on interviews with partygoers. He then described his initial interview with Cortez, during which Cortez denied being at the party, claimed he was at home, and denied even knowing Friend. Detective stated that Cortez was "smirking a lot" during the interview, was not being forthcoming with information, and appeared to be "kind of deceitful going around things." Detective then testified about the crime scene generally, describing a bullet hole in the gas tank of a vehicle that had been parked near the shooting and testifying about gunshots that could be heard on a doorbell video recording.

¶15 After the State rested, Cortez presented his defense, the main thrust of which was that Cortez had acted in self-defense. Cortez called Friend to testify, and Friend stated that Cortez was a "peacemaker" who had never started a fight in their ten-year friendship. Friend testified that after he left the party to walk home, Cortez caught up with him and the two returned to the house to get "the car and leave." At that point, Cortez told Friend he was going to "talk to" Nate and "calm him down." According to Friend, Nate was outside of the house on the steps when he and Cortez returned; Nate and Cortez then went inside the house for "like 20 seconds" while Friend waited on the sidewalk, and as Cortez and Nate emerged from the house, Nate was "already being verbal" with Cortez. Friend testified that Cortez and Nate "circled" around each other and were "about five feet apart" when Cortez "pull[ed] his gun out." Friend testified that Nate taunted Cortez that he "wasn't going to do anything with the gun and . . . to not pull it out if he wasn't going to use it." According to Friend, Nate walked up to Cortez, "tri[ed] to reach for his gun

and then [Nate was] shot." Friend testified that he did not see any weapon in Nate's hands as Cortez was pointing the gun at him.

¶16 Cortez took the stand in his own defense. He told the jury that he had wanted to "kind of apologize" to Nate for Friend's actions earlier in the evening and that he had approached the door with that goal in mind. He testified that when he knocked, Nate opened the door and responded by "jumping" at him, taunting him with statements like, "Oh, you came back," and "You want some." Cortez testified that Nate "pulled out a blade" and said, "If you really want to get down, let's get down." Cortez clarified that he only initially perceived a blade because he heard the "pop" of a knife latching. He also testified that Nate had taken an aggressive "stance" and that as Nate walked toward him, Cortez saw "the gleam of a blade." Cortez testified that he opened fire when Nate "reach[ed]" at him while advancing toward him.

¶17 Cortez further stated that he fled the scene because he "didn't know what to do." He testified that he got "rid of" the gun, went home, and messaged a few friends that he "ain't coming home." He explained that, in his initial interview with police, he had denied that he had been involved in the incident because "it didn't seem like it was going to go the way [he] thought it was going to go." Cortez also testified that he told his cellmate the details of the incident, including that Nate had a knife. In rebuttal, the State called Cortez's cellmate, who testified that Cortez had told him about the shooting "about a dozen times" during their incarceration together but had never mentioned that Nate had a knife.

¶18 At the conclusion of evidence, the trial court instructed the jury, and it included instructions regarding perfect self-defense. But no instructions were requested or given regarding imperfect self-defense.

¶19 After deliberation, the jury convicted Cortez on all eight charges. At sentencing, Cortez asked for a one-step reduction of

his first-degree-felony convictions under section 76-3-402 of the Utah Code (a "402 reduction"), asserting that the State's decision to charge him with seven felony discharge counts rather than one count of attempted murder was a "legal technique[]" that the State had employed to, among other things, preclude him from asserting imperfect self-defense. The State denied that accusation and asserted that it had not charged Cortez with attempted murder because, in its view, the evidence did not support that charge. The trial court denied Cortez's request for a 402 reduction, stating that it did not "find that the State ha[d] operated in a way that would be contrary to the fundamental interest of justice." The court then sentenced Cortez to prison.

*Post-Trial Events*

¶20    After Cortez's conviction, an investigator (Investigator) working with Cortez's appellate attorneys interviewed Juror 6. Juror 6 told Investigator that he "does not have any relatives that are in law enforcement" but that he "works on a regular basis with law enforcement officers." He also reiterated that he has "several good friends that are in the police departments, law enforcement services and corrections." And he told Investigator, among other things, that he was "surprised he was selected to be on this jury based on his connection to law enforcement." When Investigator asked Juror 6 if he would tend to give more credit to a law enforcement officer's testimony than to other witnesses' testimony, Juror 6 told Investigator that "as a general statement, he would put more credibility toward law enforcement. However, he would try not to be biased. Nonetheless, he would lean closer to law enforcement in most cases."

¶21    Investigator also interviewed Juror 7, who acknowledged that "he has two relatives in law enforcement," and he described the law enforcement profession as the "family business." He explained that "[b]oth his father and brother are graduates of the FBI National Academy and through that association, . . . [he has

been] connected for many decades with police administrators, executives and others in law enforcement and the FBI." Juror 7 told Investigator that if he had been asked "whether he would believe a police officer over a citizen, he would have applied the 'innocent until proven guilty' standard." But he added that "it is typically not the case where the police have arrested the wrong person." Juror 7 also stated that he was "surprised" that he had been selected to serve on the jury.

## ISSUE AND STANDARD OF REVIEW

¶22    Cortez now appeals, asserting that he is entitled to a new trial because Counsel rendered constitutionally ineffective assistance. "When an ineffective assistance claim is raised for the first time on appeal, it presents a question of law." *State v. Rivera*, 2022 UT App 44, ¶ 21, 509 P.3d 257. Cortez acknowledges that some of his ineffective assistance claims cannot be supported by the evidence in the record, and with regard to these claims he seeks a remand, pursuant to rule 23B of the Utah Rules of Appellate Procedure, to enable him to supplement the record with evidence to support the claims. "A remand under rule 23B is available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *State v. Tuinman*, 2023 UT App 83, ¶ 53, 535 P.3d 362 (cleaned up), *cert. denied*, 540 P.3d 79 (Utah 2023).

## ANALYSIS

¶23    To succeed on an ineffective assistance claim, Cortez must make a two-part showing: (1) that Counsel's performance was deficient in that it "fell below an objective standard of reasonableness," and (2) that this deficient performance "prejudiced the defense" such that "there is a reasonable probability that, but for [C]ounsel's unprofessional errors, the

result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *accord State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350; *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871. Failure to prove either component is fatal to the claim; "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687. Thus, "if either is lacking, the claim fails and this court need not address the other." *State v. Kufrin*, 2024 UT App 86, ¶ 55, 551 P.3d 416 (cleaned up).

¶24 In this case, Cortez claims that Counsel rendered ineffective assistance in three ways: (1) by failing to challenge the constitutionality of Utah's affirmative defense statutory scheme, a scheme which precluded him from asserting imperfect self-defense to defend the felony discharge of a firearm charges; (2) by not objecting to (or moving to strike) Nate's testimony about Cortez being on probation; and (3) by not engaging in a more searching inquiry into the potential biases of Juror 6 and Juror 7. Cortez attempts to support the first two claims by pointing to evidence already in the record. But Cortez acknowledges that his third claim is unsupported by evidence in the record, and with regard to that claim he seeks a remand, pursuant to rule 23B, to allow him to supplement the record. For the reasons discussed below, we reject each of Cortez's ineffective assistance claims, and we deny Cortez's motion for a rule 23B remand.

## I. The Constitutional Challenge

¶25 Cortez first asserts that Counsel rendered ineffective assistance by failing to mount a state constitutional challenge to a provision of Utah's criminal code that prevented Cortez from raising an imperfect-self-defense claim in this case. For the reasons discussed, we disagree.

¶26 The Utah Constitution states that "[a]ll laws of a general nature shall have uniform operation." Utah Const. art. I, § 24. This

provision is intended to restrain our legislature "from the fundamentally unfair practice of classifying persons in such a manner that those who are similarly situated with respect to the purpose of a law are treated differently by that law, to the detriment of some of those so classified." *State v. Outzen*, 2017 UT 30, ¶ 16, 408 P.3d 334 (cleaned up). "A statute is not uniform in its operation, and is thus unconstitutional, if (1) the statute creates any classifications, (2) those classifications impose any disparate treatment on persons similarly situated, and (3) the legislature had no reasonable objective that warrants the disparity." *Id.* (cleaned up).

¶27 Cortez's argument centers on a provision in Utah's criminal code that allows a defendant to assert "imperfect self-defense" to defend against a charge of murder or attempted murder but not to defend against other charges, including (as relevant here) charges of felony discharge of a firearm. *See* Utah Code § 76-5-203(4)(a) (limiting imperfect self-defense to "a charge of murder or attempted murder"); *see also State v. Campos*, 2013 UT App 213, ¶ 72 n.8, 309 P.3d 1160 ("Imperfect self-defense is available only as a defense to a charge of murder or attempted murder."). "Imperfect self-defense applies where the jury finds that the defendant had a reasonable belief that the circumstances provided a legal justification or excuse for the conduct although the conduct was not legally justifiable or excusable under the existing circumstances." *State v. Flynn*, 2022 UT App 89, ¶ 15, 515 P.3d 492 (cleaned up). Unlike perfect self-defense, which if proved results in acquittal, "imperfect self-defense is a partial defense, which reduces a charge of murder to manslaughter" or attempted murder to attempted manslaughter. *State v. Grant*, 2021 UT App 104, ¶ 32, 499 P.3d 176 (cleaned up); *see also* Utah Code § 76-5-203(4)(c).

¶28 Cortez claims that this statutory scheme, which limits the applicability of imperfect self-defense to charges of murder or attempted murder, unconstitutionally "creates two distinct

classes of people—those who are charged with murder or attempted murder and those charged with any other crime." In his view, this classification results in disparate treatment because persons who are charged with murder or attempted murder have the option of being able to assert imperfect self-defense, unlike those charged with any other crime. In Cortez's situation, he argues that the State had a choice in how to charge him in this case: it could have charged him with either attempted murder or felony discharge because, in his view, the allegations "qualified to be charged as attempted murder." And if he had been charged with attempted murder, imperfect self-defense would have been available to him. Yet because he was charged with felony discharge instead, Cortez argues that he "received different treatment than similarly situated criminal defendants . . . based on the whim of the prosecutor in deciding which of two possible charges to bring."

¶29 Against this backdrop, we must assess whether Counsel provided ineffective assistance by opting not to challenge the constitutionality of this statutory scheme. Under the relevant framework, for Cortez's claim to succeed, Counsel's performance must have been deficient in that it "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. In evaluating the reasonableness of an attorney's performance, we often look to whether the attorney's actions were motivated by strategy. *See Scott*, 2020 UT 13, ¶ 35 ("To be sure, the performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions."). And while "the ultimate question is not whether there was a possible strategic reason for counsel's conduct, but instead whether that conduct was objectively reasonable," *id.*, "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance," *Ray*, 2020 UT 12, ¶ 34; *see also Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in

any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.").

¶30     Here, Counsel's trial strategy was objectively reasonable even if it did not include a challenge to the constitutionality of Utah's imperfect-self-defense law. In this case, there were strategic reasons to forgo an opportunity to assert imperfect self-defense. As noted, imperfect self-defense, even if successful, does not lead to complete acquittal but, instead, to a reduction in charges. Effectively, it allows the jury to convict a defendant of a lesser offense, and it offers the jury a middle-ground way to convict a defendant of *something* while not convicting the defendant of the more serious charged offense.

¶31     In a similar context involving the decision to request a lesser-included-offense instruction, we have often held that attorneys do not act unreasonably when they opt for an all-or-nothing strategy that might give the defendant the best chance at complete acquittal. *See, e.g.*, *Flynn*, 2022 UT App 89, ¶ 18 ("Even when there is a basis for a lesser-included-offense instruction, counsel can reasonably decide not to request one." (cleaned up)). Indeed, "counsel may have perfectly valid tactical reasons to forgo [a lesser-included-offense] instruction and to instead present an all or nothing defense that entails avoiding a lesser-included-offense instruction in the hopes the jury will find the defendant totally innocent of any wrongdoing." *Id.* (cleaned up); *accord State v. Hull*, 2017 UT App 233, ¶ 16, 414 P.3d 526. For this reason alone, we simply cannot conclude that Counsel's decision not to fight harder for an imperfect-self-defense instruction was constitutionally unreasonable.

¶32 Moreover, Counsel's strategy appears even more reasonable when one considers that she had the option here—which she pursued—of seeking a lighter sentence, following conviction, through a 402 reduction. Instead of mounting a constitutional challenge in an effort to make an imperfect-self-

defense argument on the front end—and thereby providing the jury an attractive middle ground upon which it could have convicted Cortez—Counsel tried to get her client acquitted outright (at least on the firearm charges) by arguing perfect self-defense, and when that didn't work, Counsel argued on the back end for a more lenient sentence by asserting that the State unfairly prosecuted Cortez by pursuing felony discharge rather than attempted murder, thereby depriving Cortez of the opportunity to claim imperfect self-defense. We cannot say that this strategy was objectively unreasonable.

¶33 Finally, our conclusion in this regard is bolstered by our perception of the difficulty of the constitutional challenge that Counsel opted to forgo. The argument Cortez now suggests Counsel should have made appears to be an entirely novel one. That is, Cortez does not point to any specific authority—in Utah or elsewhere—indicating that his challenge to Utah's imperfect-self-defense law would have been successful. And when there is an absence of authority supporting such an argument, an attorney's decision not to make that argument might very well be a reasonable one. *See generally Strickland*, 466 U.S. at 689 (explaining that courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance").

¶34 To be sure, an attorney's obligation to render effective assistance will sometimes require that attorney to raise arguments that are not entirely based on settled law. *See State v. Silva*, 2019 UT 36, ¶ 19, 456 P.3d 718 (stating that an attorney's performance should not be judged "based only on settled law" and that attorneys are not "categorically excused" from raising arguments that are "not supported by existing legal precedent"). But Cortez must demonstrate that Counsel's choice, in this case, was unreasonable. *See id.* ¶ 20 (stating that, regardless of whether precedent supports an argument, "the proper measure of attorney performance remains simply reasonableness under prevailing

professional norms" (cleaned up)). Cortez has not made the necessary showing. As noted, Cortez cites no specific Utah case law supporting his argument, nor has he demonstrated that this issue is percolating in other jurisdictions in his favor. He offers no analogous cases interpreting the Equal Protection Clause of the federal constitution, nor does he cite any academic literature or commentary supporting the argument. And the State, in its brief, offers possible reasons why our legislature might have rationally wanted to draw a distinction between murder crimes and other crimes for purposes of allowing an imperfect-self-defense argument. While we stop well short of deciding the merits of the constitutional argument, we agree with the State's assertion that Counsel "could . . . have reasonably concluded that a rational basis exists for the long-established limitation of imperfect self-defense to murder crimes."

¶35    Thus, when we consider the circumstances as a whole—the difficulty of the constitutional argument, the potential upside to an all-or-nothing defense, and the post-trial fail-safe option of being able to argue for a 402 reduction—we conclude that Counsel did not perform deficiently by opting not to mount a constitutional challenge to Utah's imperfect-self-defense law. On this basis, we reject Cortez's first ineffective assistance claim.

## II. The Probation Testimony

¶36    Next, Cortez asserts that Counsel rendered ineffective assistance by failing to object—or move to strike or for a curative instruction—after Nate mentioned, during his trial testimony, that he thought Cortez might have been on probation. Cortez argues that Nate's statement in this regard was inadmissible under various evidentiary rules and that competent counsel would have taken action. But on the record before us, there were strategic reasons why Counsel may have decided to forgo an objection or other request for relief. Therefore, we cannot conclude that Counsel's performance was deficient.

¶37    It is important here that Nate's testimony about Cortez being on probation was unsolicited. The statement came out during cross-examination, and the discussion was sparked by Counsel asking Nate whether Cortez seemed sober on the evening in question. Nate answered, "Yeah, I think so," and he noted that Cortez hadn't responded positively to Nate's offer to share "weed" with him. Unsolicited, Nate then speculated that Cortez might have turned down such offers because he "was on probation or something." This testimony was not responsive to the original question—which simply asked whether Nate thought Cortez was sober—and as a result, Counsel could not as a practical matter have headed Nate's statement off at the pass by asking a different question. Thus, the only recourse available to Counsel was to move to strike the testimony after it had come in and to obtain a curative instruction telling the jury to disregard it. *See, e.g.*, *State v. King*, 2024 UT App 151, ¶¶ 32–33, 559 P.3d 96.

¶38    In this light, the question is whether it was reasonable for Counsel to simply move forward with her cross-examination instead of moving to strike. As explained above, when evaluating the reasonableness of an attorney's performance, we will often look to whether the attorney's actions were motivated by strategy. *See Scott*, 2020 UT 13, ¶ 35. In doing so, we have held that "decisions regarding whether to move to strike and seek a curative instruction are highly strategic ones that courts are loathe to second-guess." *King*, 2024 UT App 151, ¶ 33. After all, a curative instruction often "invoke[s] the pink-elephant paradox: by being told *not* to think about a thing, jurors may actually be more likely to think about that thing." *Id.*; *see also State v. Popp*, 2019 UT App 173, ¶ 50, 453 P.3d 657 ("[A] curative instruction may actually serve to draw the jury's attention toward the subject matter of the instruction and further emphasize the issue the instruction is attempting to cure."); *State v. Garrido*, 2013 UT App 245, ¶ 26, 314 P.3d 1014 ("Choosing to forgo a limiting instruction can be a reasonable decision to avoid drawing attention to unfavorable testimony.").

¶39    In this case, Counsel could have reasonably chosen not to reemphasize Nate's unanticipated made-in-passing speculative reference to Cortez possibly being on probation. Counsel could have reasonably believed that moving to strike the testimony and obtaining a curative instruction would have been overkill and that doing so would have risked emphasizing the point to the jury. Thus, Cortez has not demonstrated that Counsel performed deficiently by opting not to take action. On this basis, we reject Cortez's second claim of ineffective assistance.

### III.  The Rule 23B Motion

¶40    Finally, Cortez takes issue with certain aspects of the jury selection process. Notably, Cortez does not appeal the trial court's denial of his for-cause objection to Juror 6; instead, Cortez asserts that Counsel rendered ineffective assistance during jury selection by failing to engage in a more searching colloquy with Juror 6 and Juror 7. Cortez acknowledges that the record does not support this claim, but he asks us to remand the case, pursuant to rule 23B of the Utah Rules of Appellate Procedure, for additional proceedings in which he can further develop the record in support of this claim. Under this rule, a defendant must make a four-part showing to obtain a remand order. *State v. Norton*, 2015 UT App 263, ¶ 6, 361 P.3d 719. First, the rule 23B motion "must be supported by affidavits setting forth facts that are not contained in the existing record." *Id.* (cleaned up). Second, the affidavits must contain "allegations of fact that are not speculative." *Id.* (cleaned up). Third, the allegations contained in the affidavits "must show deficient performance by counsel." *Id.* (cleaned up). And finally, the affidavits "must also allege facts that show the claimed prejudice suffered by the appellant as a result of the claimed deficient performance." *Id.* (cleaned up).

¶41    Cortez has satisfied the first two requirements by providing us with affidavits containing nonspeculative allegations which are not set forth in the existing record. Thus, the

question is whether his new allegations support an ineffective assistance claim. Indeed, "if the defendant could not meet the test for ineffective assistance of counsel, even if his new factual allegations were true, there is no reason to remand the case, and we should deny the motion." *State v. Griffin*, 2015 UT 18, ¶ 20, 441 P.3d 1166. As explained above, for Cortez to succeed, he must make a two-part showing: (1) that Counsel's performance was deficient in that it "fell below an objective standard of reasonableness," and (2) that this deficient performance "prejudiced the defense" such that "there is a reasonable probability that, but for [C]ounsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 687–88, 694. And failure to prove either component is fatal to his claim; "if either is lacking, the claim fails and this court need not address the other." *Kufrin*, 2024 UT App 86, ¶ 55 (cleaned up).

¶42 Cortez centers this ineffective assistance claim on juror bias. The Sixth Amendment to the U.S. Constitution "guarantees a criminal defendant the right to an unbiased and impartial jury." *State v. King*, 2008 UT 54, ¶ 15, 190 P.3d 1283. The Utah Rules of Criminal Procedure further implement safeguards for juror impartiality. *See* Utah R. Crim. P. 18. Those rules provide that a juror should be removed for cause based on "[t]he existence of any social, legal, business, fiduciary or other relationship between the prospective juror and any party, [or] witness," where the relationship "suggest[s] to reasonable minds that the prospective juror would be unable or unwilling to return a verdict which would be free of favoritism." *Id.* R. 18(e)(4). This rule also provides that a juror should not be impaneled if his or her "[c]onduct, responses, state of mind or other circumstances . . . reasonably lead the court to conclude the juror is not likely to act impartially." *Id.* R. 18(e)(14).

¶43 In this case, Cortez asserts that Counsel should have inquired further into Juror 6's and Juror 7's personal and

professional relationships with law enforcement officers and potential for bias toward law enforcement officer testimony. We discuss Cortez's claims with regard to each of these jurors, in turn, beginning with Juror 7, and for the reasons discussed we reject Cortez's assertions and deny his motion for a rule 23B remand.

A.    Juror 7

¶44    Cortez's challenge regarding Juror 7 fails on prejudice grounds. Even if we assume, for purposes of the discussion only, that Counsel performed deficiently by not asking additional questions of Juror 7, Cortez has not demonstrated that this deficient performance resulted in prejudice because the post-trial affidavit regarding Juror 7 adds no new material information and doesn't demonstrate juror bias.

¶45    With respect to his personal relationships with law enforcement officers, Juror 7 is quoted in the post-trial affidavit as stating that his "father and brother were in law enforcement" and as describing the law enforcement profession as the "family business." He also told Investigator that he had close personal relationships with law enforcement throughout his life, stating that "[b]oth his father and brother are graduates of the FBI National Academy and through that association, [he has been] connected for many decades with police administrators, executives and others in law enforcement and the FBI."

¶46    But Juror 7 had already disclosed this information in his questionnaire before trial, stating that his "[b]rother was a chief of police and [his] father is a retired police officer" and that he knew "many police officers and federal agents." And he again disclosed this information on the record during the jury selection process, explaining that his father is a retired police officer and that his brother is a retired police lieutenant and chief of police. Thus, the post-trial affidavit regarding Juror 7 contains no new material details about his relationships with law enforcement.

¶47    The same is true of Juror 7's statements regarding potential bias toward law-enforcement testimony. In his pretrial questionnaire, Juror 7 stated that he would "not give more or less weight to the testimony of a law enforcement officer just because they are an officer" and that there was no "reason [he] could not serve as a fair and impartial juror." And he confirmed this during jury selection, declining to raise his hand when the court asked whether he would be partial to law-enforcement testimony. Importantly, he didn't back down at all from these statements in the post-trial affidavit, responding to a query about "whether he would believe a police officer over a citizen" by stating that he "would have applied the 'innocent until proven guilty' standard." Although Juror 7 was quoted in the post-trial affidavit as stating that "it is typically not the case where the police have arrested the wrong person in his perspective" and that he was "surprised" that he was impaneled on the jury, we do not discern in these statements an indication that Juror 7 would give more weight to the credibility of law-enforcement testimony on a given issue.

¶48    Thus, in the post-trial affidavit, just as in his pretrial questionnaire and in the jury selection process, Juror 7 disclosed his relationships with law enforcement officers *and* maintained that these relationships would not cause him to be partial toward law-enforcement-officer testimony. For that reason, Cortez has not demonstrated that any deficient performance on Counsel's part prejudiced him with regard to Juror 7.[3]

---

3. Our conclusion as to prejudice is bolstered by the fact that law-enforcement testimony did not play a central role in this case. In *State v. Arriaga*, 2012 UT App 295, 288 P.3d 588, we analyzed whether two jurors' potential bias toward law-enforcement-officer testimony had prejudiced the defendant's case, and in that analysis, we considered whether the officer's testimony and credibility were central to the case. *Id.* ¶ 16. We emphasized that

(continued…)

B.     Juror 6

¶49    Cortez's ineffective assistance claim regarding Juror 6 likewise fails, parts of it for similar reasons as Juror 7 and parts of it for different reasons.

¶50    With regard to Juror 6, Cortez first asserts that Counsel rendered ineffective assistance by not asking Juror 6—for a third time during jury selection—whether he could be fair and impartial. We reject this claim on deficient-performance grounds because Juror 6 had already answered that question twice—once in the questionnaire, in writing, and once during live jury selection, by not raising his hand—and had thereby already given two sworn answers indicating that, despite his contacts with law enforcement, he believed he could nevertheless be fair and impartial. We cannot fault Counsel for opting not to ask that question again, because Counsel could have reasonably believed that she was unlikely to get a different answer the third time.

---

the case did not involve "a trial in which the outcome hinged on the testimony of police officers" and that "the officer's credibility was not really at issue." *Id.* And we held that, under those circumstances, it was "difficult to see any possibility of prejudice" to the defendant. *Id.*

So too here. The only witnesses who saw the altercation between Cortez and Nate moments before the shooting were Nate, Friend, and Cortez. The law enforcement officers in this case arrived on the scene later, and they mostly testified as to the aftermath—Nate's injuries, the crime scene generally, and investigative interviews with Cortez. On these facts, the law-enforcement testimony did not directly bear on whether Cortez was justified in firing the gun in self-defense. This context constitutes an additional reason for us to conclude that Cortez's prejudice arguments are unpersuasive.

¶51    We acknowledge that Juror 6 did indeed give a different answer later, in the post-trial affidavit. There, he offered a "general statement" that "he would put more credibility toward law enforcement," but he stated that "he would try not to be biased" even though "he would lean closer to law enforcement in most cases." This statement is certainly problematic, and if Juror 6 had given that statement in the questionnaire or during jury selection, it would have been incumbent upon the trial court or defense counsel to, at a minimum, engage in a more searching inquiry about Juror 6's potential bias. *See State v. Taylor*, 2025 UT App 14, ¶¶ 26–27, 564 P.3d 962 (concluding that a juror's comments that she would give "law enforcement testimony" "more weight than the testimony of anybody else that testified" and that she "would have a hard time" "if it came down to the police officer's word versus the defendant" were problematic and indicative of juror bias (cleaned up)).

¶52    But we judge Counsel's performance based on what was known in the moment, *see State v. Nelson*, 2015 UT 62, ¶ 14, 355 P.3d 1031 (assessing whether defense counsel's actions were competent "in the real-time context of trial" (cleaned up)), and in the moment when Counsel had to decide whether to dig deeper about Juror 6's ability to be fair and impartial, Counsel already had Juror 6 on the record—twice—on the topic. On these facts, Cortez has not demonstrated that Counsel acted unreasonably by not asking the same question for a third time.

¶53    Cortez next asserts that Counsel was ineffective for not asking follow-up questions designed to elicit additional details about Juror 6's already-disclosed relationships with law enforcement officers. On this point, we conclude—as we did with Juror 7—that Cortez has not demonstrated that Counsel's decision not to follow up with Juror 6 on this subject caused him to sustain any prejudice.

¶54    As with Juror 7, the post-trial affidavit regarding Juror 6 simply doesn't contain any additional material details about his relationships with law enforcement officers. After trial, Juror 6 told Investigator that he "does not have any relatives that are in law enforcement" but that he "works on a regular basis with law enforcement officers because of his role within EMS." He also reiterated that he has "several good friends that are in the police departments, law enforcement services and corrections."

¶55    Yet Juror 6 had already disclosed this information before trial. In the pretrial questionnaire, Juror 6 stated that he had "[p]articipated in controlled substance buys with the Salt Lake County Sheriff's Department" and was "called to testify in court on a few instances about [a] sting operation." And he stated that he had personal and professional relationships with law enforcement officers. Then, during live jury selection, Juror 6 told the court he was "familiar with law enforcement officers" because he worked with them "hand in hand," and that he worked with "off duty police officers" where he had "hired them to work with [him]." Juror 6 also stated that he had "very good friends that [were] police officers throughout the state."

¶56    Indeed, given these relationships, Counsel moved to strike Juror 6 from the jury for cause based on "his connections with law enforcement almost to a degree that make him law enforcement" and his lack of recognition that he might be biased. The court denied the challenge, explaining correctly that there is no rule prohibiting members of any particular profession—including law enforcement—from sitting on juries. For our purposes here, the key point is that no new information came to light regarding Juror 6's personal and professional relationships with law enforcement in the post-trial affidavit, so Cortez cannot show that Counsel's

failure to engage in further inquiry on this point during jury selection would have changed the outcome here.[4]

CONCLUSION

¶57    For the reasons discussed, Cortez has not carried his burden of demonstrating that Counsel rendered ineffective assistance in any of the particulars he asserts. We therefore affirm his convictions and deny his motion for a rule 23B remand.

———————

4. As we explained earlier, *see supra* note 3, the law enforcement officers' testimony in this case was not central to the ultimate issue of whether Cortez was acting in self-defense when he fired shots at Nate. Thus, as in *Arriaga*, this fact provides an additional basis for our conclusion that Cortez has not demonstrated that he was prejudiced by Counsel's decision not to ask additional questions of Juror 6 about his law enforcement connections. *See* 2012 UT App 295, ¶ 16.